IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


U.S. ETHERNET INNOVATIONS, LLC,                    No. C 10-3724 CW

      Plaintiff,

    v.

ACER, INC.; ACER AMERICA
CORPORATION; APPLE, INC.; ASUS
COMPUTER INTERNATIONAL; ASUSTEK
COMPUTER, INC.; DELL, INC.;
FUJITSU, LTD.; FUJITSU AMERICA,
INC.; GATEWAY, INC.; HEWLETT
PACKARD CO.; SONY CORPORATION;
SONY CORPORATION OF AMERICA; SONY
ELECTRONICS INC.; TOSHIBA
CORPORATION; TOSHIBA AMERICA,
INC.; and TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.,

      Defendants.

INTEL CORPORATION; NVIDIA
CORPORATION; MARVELL
SEMICONDUCTOR, INC.; ATHEROS
COMMUNICATIONS, INC.; and
BROADCOM CORPORATION,

      Intervenors.

_____/

**United States District Court**
For the Northern District of California

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC,, | No. C 10-5254 CW |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT ADDRESSING MARKING AND NOMINAL DAMAGES (Docket Nos. 766 in 10-3724, 450 in 10-5254), GRANTING USEI'S RULE 56(D) MOTION (Docket No. 793 in 10-3724) AND GRANTING IN PART AND DENYING IN PART USEI'S MOTION FOR LEAVE TO FILE A NOTICE OF NEWLY DISCOVERED EVIDENCE AND A SURREPLY (Docket No. 823 in 10-3724) |
| v. | |
| AT&T MOBILITY LLC; BARNES & NOBLE, INC.; CLAIRE'S BOUTIQUES, INC.; J. C. PENNEY COMPANY, INC.; SALLY BEAUTY HOLDINGS, INC.; ANN TAYLOR STORES CORPORATION; ANN TAYLOR RETAIL, INC.; HARLEY-DAVIDSON, INC.; HARLEY-DAVIDSON MOTOR COMPANY, INC.; KIRKLAND'S INC.; KIRKLAND'S STORES, INC.; MACY'S, INC.; MACY'S RETAIL HOLDINGS, INC.; MACY'S WEST STORES, INC.; NEW YORK & COMPANY, INC.; LERNER NEW YORK, INC.; RADIOSHACK CORPORATION; RENT-A-CENTER, INC.; and THE DRESS BARN, INC., | |
| Defendants. | |

AND ALL RELATED CLAIMS AND COUNTERCLAIMS

Intervenors Intel Corporation, Broadcom Corporation, Marvell Semiconductor Inc., Nvidia Corporation, Atheros Communications Inc. and Sigma Designs, Inc., and Defendants Acer, Inc., Acer America Corporation, Apple, Inc., Asustek Computer Inc., AT&T Services, Inc., Dell Inc., Fujitsu Ltd., Fujitsu America, Inc., Gateway, Inc., Hewlett Packard Co., Sony Corporation, Sony Corporation of America, Sony Electronics Inc., Toshiba Corporation, Toshiba America, Inc., and Toshiba America Information Systems, Inc. (collectively, with Defendant ASUS Computer International, Movants) move for partial summary judgment against Plaintiff U.S. Ethernet Innovations, LLC (USEI), seeking a determination that USEI cannot recover pre-suit damages for

infringement of three of the patents-in-suit, U.S. Patent Nos.
5,434,872, issued on July 18, 1995 (the '872 Patent), 5,307,459,
issued on April 26, 1994 (the '459 Patent) and 5,299,313, issued
on March 29, 1994 (the '313 Patent) based on its failure to mark
under 35 U.S.C. § 287(a).[1]  ASUS Computer International also seeks
a determination that USEI cannot recover pre-suit damages for
infringement of the '313 Patent based on its failure to mark.
Intel and Nvidia further move for partial summary judgment
precluding USEI from recovering more than nominal damages against
them.  USEI opposes the motion, moves to continue resolution of
Intel and Nvidia's request under Federal Rule of Civil Procedure
56(d) and moves for leave to file a notice of additional evidence
and a surreply.  Having considered the papers filed by the parties
and their arguments at the hearing on this motion, the Court
GRANTS in part the motion for partial summary judgment, DENIES it
in part, GRANTS the Rule 56(d) motion and GRANTS IN PART AND
DENIES IN PART the motion for leave to file a notice of additional
evidence and surreply.

BACKGROUND

On June 1, 1999, 3Com Corporation, the original owner of the
patents-in-suit, entered into a license agreement with
International Business Machines Corporation (IBM).  Constant Decl.
¶ 2, Ex. A.1.  Among other things, the license agreement addressed
IBM's use of "3COM Licensed Patents," which are defined to "mean

---

[1] Movants do not seek summary judgment regarding U.S. Patent
No. 5,732,094 (the '094 Patent) on this ground.  Accordingly,
USEI's argument that the '094 Patent is not subject to the
requirements of 35 U.S.C. § 287(a) is not on point.

United States District Court
For the Northern District of California

all patents," with certain limitations, "issued or issuing on patent applications entitled to an effective filing date prior to June 1, 2005" and for which 3Com had the right to grant licenses. Id. at § 1.4.  The license agreement provided in relevant part that 3Com

> grants to IBM, as Grantee, a nonexclusive and worldwide license under 3COM's Licensed Patents:
>
> (a)  to make (including the right to use any apparatus and practice any method in making), use, import, offer for sale, lease, sell, and/or otherwise transfer or distribute IBM's Licensed Products, and/or practice any businesses related to such IBM Licensed Products;
>
> (b)  to have IBM's Licensed Products made by another manufacturer for the use, importation, offer for sale, lease, sale and/or other transfer or distribution by IBM only when the conditions set forth in Section 2.2 are met.
>
> . . .

Id. at § 2.1.2.  The phrase "any apparatus" was not defined in the license agreement.  However, the agreement did provide definitions for several types of apparatuses, including "Manufacturing Apparatus," "Data Processing Apparatus" and "Semiconductor Apparatus."  Id. at §§ 1.8-1.11.

Section 2.2 provided,

> The License granted in [Section 2.1.2(b)] to the respective Grantee to have products made by another manufacturer:
>
> . . .
>
> (b)  shall only apply when the specifications for such Grantee's Licensed Products were created by or for the Grantee (either solely or jointly with one or more third parties; and
>
> (c)  shall not apply to (i) any methods used; or (ii) any products in the form manufactured or marketed by said other manufacturer prior to the Grantee's furnishing of said specifications.

4

. . .

Id. at § 2.2.

The agreement defined "IBM Licensed Products" to mean "IHS Products and Peripheral Devices."  Id. at § 1.5.  In turn, "IHS Products" was defined to mean,

> an Information Handling System or any instrumentality or aggregate of instrumentalities (including without limitation, any component, subassembly, computer program or supply) designed for incorporation in an Information Handling System. . . .

Id. at § 1.2.  An "Information Handling System" referred to

> any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control, entertainment, or other purposes.

Id. at § 1.1.  A "Peripheral Device" meant "an ancillary device which is designed to operate in combination with a Grantee's Licensed Product."  Id. at § 1.19.  The agreement did not require that IBM Licensed Products be marked with the relevant patents utilized, including the patents-in-suit.

On November 8, 2002, Intel and 3Com entered into three agreements to resolve litigation taking place between 3Com and Xircom, Inc., a subsidiary of Intel.  Jones Decl., Ex. AA.[2]  These included a settlement agreement, a covenant not to sue and a cross license.  The latter two documents were attached to the settlement agreement as exhibits.  In the covenant not to sue, Intel and 3Com agreed not to assert "any Patent" that they owned against one another for a two-year time period.  Id. at Ex. I

---

[2] Although USEI refers to this as the "IBM Settlement Agreement," IBM was not a party to any of the three agreements.

United States District Court
For the Northern District of California

(Covenant Not to Sue) §§ 3.2.1, 3.2.2.  The covenant not to sue did not require Intel to mark any products it made during this time period to qualify for the protection under it.  In the cross-license agreement, 3Com granted Xircom and Intel a license to practice five of 3Com's patents, none of which are at issue in this case.  Id. at Ex. H (Cross License Agreement) §§ 1.6, 3.3, 3.4.

Between 2003 and 2006, 3Com's patented product sales totaled about $200 million.  Constant Decl., Ex. A.5, 475:16-23; Constant Decl., Ex. A.6.  Between November 2003 and November 2004, Intel sold more than 140 million components that USEI now accuses of infringing the patents-in-suit, for almost $1.9 billion.  Insley Decl. ¶ 3, Ex. B.  Between 2004 and 2009, IBM purchased more than twenty-five million Intel components, for more than $350 million.  Insley Decl. ¶ 2, Ex. A.  The "vast majority" of the components that IBM purchased from Intel were incorporated into IBM products that it subsequently sold to customers.  Constant Decl., Ex. A.3, ¶ 10.[3]  In the present lawsuit, USEI's infringement contentions against Intel accuse many of the components that IBM purchased for inclusion in its products.  Constant Decl., Ex. A.2, 2-5.  Neither IBM nor Intel marked their products with the '872, '459 or '313 Patent numbers.  Schiffhauer Decl. ¶ 2; Constant Decl., Ex. A.3 ¶ 11.

---

[3] In their reply brief, Movants cite "Exhibit C" to the Constant declaration.  However, there is no such exhibit attached to this declaration, and it appears that Movants intended to refer to Exhibit A.3 to the declaration instead.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Starting in 2003, 3Com was involved in a separate lawsuit in this district with Realtek Semiconductor System and D-Link Systems, Inc.  In that case, 3Com alleged that Realtek and D-Link infringed of the '872, '459 and '094 Patents.  The '313 Patent was not at issue in that case.  In 2008, the court denied Realtek's motion for partial summary judgment based on marking.  Jones Decl., Ex. I.  In opposing the summary judgment motion, 3Com offered "a spreadsheet showing the sales of products practicing the patents at issue for which marked samples have been located and products for which marked samples could not be found during the period roughly from 1997 until [July 13, 2004] . . . According to this spreadsheet, 3Com sold 32,196,864 units practicing the patents at issue during this time, of which 4,803,508 units, or 14.9 percent were of product types for which 3Com could not locate a marked sample."  Id. at 1, 7.  Although the court noted that "[m]arking 85 percent of products sold is almost certainly not marking 'substantially all' products," it held that a jury could infer, based on other evidence in the record, that, although 3Com had lost some documentary evidence, it had a practice of marking its products since at least 1997 and thus that the remaining products for which documentary evidence did not exist were in fact marked.  Id. at 7-8.  USEI has offered here the evidence that 3Com submitted in the Realtek case.

At the deposition taken in this matter, USEI's Rule 30(b)(6) witness testified that he did not know if there were ever any products marked with the '313 Patent produced by 3Com or anyone else.  Constant Decl., Ex. A.7, 21:6-14.  USEI contends that 3Com did practice this patent.  Constant Decl., Ex. A.2, 18.

United States District Court
For the Northern District of California

USEI also offers evidence that it has entered into license agreements with Realtek, ADMtek and VIA, to authorize them to use some or all of the '459, '872 and '094 Patents, that these licenses included marking requirements, and that the licenses had complied with their marking obligations or that 3Com took steps to ensure that they did so.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

8

United States District Court
For the Northern District of California

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Id.

**United States District Court**
For the Northern District of California

1    If the moving party does not meet its initial burden of

2    production by either method, the non-moving party is under no

3    obligation to offer any evidence in support of its opposition.

4    Id.  This is true even though the non-moving party bears the

5    ultimate burden of persuasion at trial.   Id. at 1107.

6                            DISCUSSION

7    I.   Failure to mark

8        Movants contend that they are entitled to a summary

9    adjudication that USEI cannot collect pre-suit damages for

10   infringement of the '459, '872 and '313 Patents pursuant to 35

11   U.S.C. § 287(a) because it cannot show that "substantially all" of

12   the licensed products were marked during the damages period[4] or

13   that it provided any or adequate actual notice of alleged

14   infringement to Movants.[5]  They argue that, even assuming that

15   3Com marked substantially all of the products that it sold itself,

16   this is not sufficient to meet the statutory requirement because

17   3Com's sales were dwarfed by the sales by Intel and IBM, as

18   licensees, of purportedly infringing products.

19

20

21

22   _____

23       [4] USEI filed the original complaint in the earlier case on
     October 9, 2009.  Title 35 U.S.C. § 286 provides that "no recovery
24   shall be had for any infringement committed more than six years
     prior to the filing of the complaint or counterclaim for
25   infringement in the action."  Accordingly, USEI may not recover
     damages for infringement that occurred prior to October 3, 2003.

26       [5] ASUS Computer International joins this motion as to the
     '313 Patent but not as to the '459 and '872 Patents.  It
27   acknowledges that it received a letter from 3Com dated December 8,
     2003, asserting that certain ASUS products infringed the '459 and
28   '872 Patents.

USEI responds that 3Com and its authorized licensees did mark "substantially all" patented products that they produced, and it disputes that Intel and IBM were actually licensed.[6]

Title 35 U.S.C. § 287(a) provides,

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, . . . may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice.  In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.  Filing of an action for infringement shall constitute such notice.

"Thus, the statute defines that '[a patentee] is entitled to damages from the time when it either began marking its product in compliance with section 287(a)[, constructive notice,] or when it actually notified [the accused infringer] of its infringement, whichever was earlier.'" Maxwell v. J. Baker, Inc., 86 F.3d 1098, 1111 (Fed. Cir. 1996) (quoting American Medical Sys., Inc. v. Medical Eng'g Corp., 6 F.3d 1523, 1537 (Fed. Cir. 1993)) (formatting in original).  The Federal Circuit has "construed

---

[6] USEI has not presented any argument to dispute Movants' contentions regarding the issue of actual notice.  Although it avers in a footnote that "[a]ny decision on actual notice is premature" in light of the status of discovery, Opp. at 19 n.51, it has not made a showing of any essential facts relevant to this determination that it may obtain through discovery.

section 287(a) to require that 'once marking has begun, it must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute.'" Id. (quoting American Medical Sys., 6 F.3d at 1537).

"In addition to governing patent owners, the provisions of 35 U.S.C. § 287(a) extend to licensees." Tulip Computers Int'l B.V. v. Dell Computer Corp., 262 F. Supp. 2d 358, 362 (D. Del. 2003) (citing 35 U.S.C. § 287(a); Devices for Medicine, Inc. v. Boehl, 822 F.2d 1062 (Fed. Cir. 1987)); see also Amsted Indus. v. Buckeye Steel Castings Co., 24 F.3d 178, 185 (Fed. Cir. 1994) ("A licensee who makes or sells a patented article does so 'for or under' the patentee, thereby limiting the patentee's damage recovery when the patented article is not marked."); Maxwell, 86 F.3d at 1111 ("licensees, such as Target, and other authorized parties, such as Target's manufacturers, must also comply" with the marking requirement). "Thus, while an infringer's failure to mark does not implicate Section 287(a), . . . a licensee's failure to mark does bear consequences for a patent owner seeking damages for infringement." Id. (internal citation omitted). "A patent owner bears responsibility to ensure that 'licensees . . . and other authorized parties . . . comply' with Section 287(a)." Id. (quoting Maxwell, 86 F.3d at 1111-12). This requirement applies to both express licensees and implied licensees. Amsted Indus., 24 F.3d at 185.

"However, with third parties unrelated to the patentee, it is often more difficult for a patentee to ensure compliance with the marking provisions." Maxwell, 86 F.3d at 1111. "A 'rule of reason' approach is justified in such a case and substantial

compliance may be found to satisfy the statute." Id. "When the failure to mark is caused by someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements." Id. at 1111-12.

As the patentee, USEI bears the burden of pleading and proving compliance with the marking statute. Id. at 1111.

As previously noted, the parties dispute whether Intel or IBM was either explicitly or implicitly licensed to practice the patents at issue. If Intel and IBM were not acting in accordance with a license or with their obligations under a license when they sold the products in question, then the sales may not be imputed to 3Com or its successor, USEI. See Maxwell, 86 F.3d at 1111-12; Tulip, 262 F. Supp. 2d at 362.

Regarding IBM, USEI argues that the 1999 license agreement between 3Com and IBM did not permit IBM to purchase infringing Intel components and then resell them, absent compliance with the requirements of section 2.2 of the agreement that IBM create the specifications for the products and not purchase premade items. Movants contend that the evidence shows that IBM did not simply sell the premade components but instead used them to make its Licensed Products and then sold the completed item. Movants argue that this was authorized by section 2.1.2(a) of the license agreement, which permits IBM to "use any apparatus . . . in making" its Licensed Products.

USEI's interpretation of the 3Com-IBM license agreement is not persuasive. The sections on which it relies govern the terms under which IBM can use 3Com's patents "to have IBM's Licensed Products made by another manufacturer." Constant Decl., Ex. A.1,

United States District Court
For the Northern District of California

§§ 2.1.2(b), 2.2.  Thus, these sections do not address the terms under which IBM can obtain parts for use when it makes its own Licensed Products.  Here, there is no dispute that IBM made its own products; the issue is instead whether it was permitted to obtain purportedly infringing, premade components and to use those components when it made its products.

As Movants contend, pursuant to section 2.1.2(a) of the license agreement, the answer is that IBM was allowed to do this.  In that provision, 3Com gave IBM the right to make its own Licensed Products and to "use any apparatus" in doing so.  The agreement placed no restriction that IBM was permitted to use only particular types of components--for example, those obtained from licensed chip suppliers--and instead unambiguously provided that "any apparatus" could be used.  USEI provides no argument that the relevant components accused here do not qualify as "any apparatus" under the terms of section 2.1.2(a).  Although USEI argues that the reference in section 2.1.2(a) to "any apparatus" should be construed to mean only "manufacturing apparatus," it provides no reason that this phrase should be so construed.  Notably, the parties to the agreement specifically defined and used the term "manufacturing apparatus" elsewhere in the agreement where they intended to do so and distinguished it from other apparatus types.  Thus, to define apparatus to mean "manufacturing apparatus" here would render other parts of the agreement surplusage or contradictory.  Further, the Court notes that the term "apparatus" is frequently used in the patents at issue themselves to refer to the claimed inventions.

**United States District Court**
For the Northern District of California

The sole case upon which USEI relies is not to the contrary. In that case, Tulip Computers, IBM had entered into a license agreement with Tulip very similar to the one at issue here.  In that case, the court held that IBM's purchase and sale of the allegedly infringing products from Dell was not imputable to Tulip because IBM had not complied with the specific restrictions on its "have made" rights under section 2.2 of the agreement and was thus not acting within its license granted by Tulip.  Tulip Computers, 262 F. Supp. 2d at 366.  However, there, IBM had entered into a remarketing agreement with Dell Computer Corporation, pursuant to which "IBM made off-the-shelf purchases of products manufactured by Dell and resold them to its customers."  Id. at 360.  Thus, there, IBM did not make the products at issue and rather purchased them premade.  In contrast, here, IBM made its own licensed products, using chips purchased from Intel.  USEI's argument that Movants' interpretation would render the restrictions in section 2.2 of the agreement "virtually meaningless" is also unavailing. IBM was not allowed to have its own licensed products made by another manufacturer practicing 3Com's patents, except in compliance with those restrictions.

Thus, because the license agreement allowed IBM to make and sell its own licensed products, using any apparatus to do so, it acted pursuant to its license rights when it made and sold products that included purportedly infringing components that it purchased from Intel.[7]  Accordingly, those products--the "vast

---

[7] USEI has moved for leave to file a surreply to address this issue.  It contends that this argument was raised for the first time in Movants' reply brief.

United States District Court
For the Northern District of California

majority" of twenty-five million between 2004 and 2009--can be imputed to 3Com and USEI.  There is no dispute that neither Intel nor IBM marked these products or components with the patent numbers.  USEI has not offered evidence that the products sold by IBM constitute a de minimis number of the licensed products or that the marked products sold by 3Com or the licensees whose agreement required marking constituted substantially all of the relevant products sold.

USEI contends that summary judgment is nevertheless inappropriate because "3Com made reasonable efforts to ensure compliance with the marking requirements."  Opp. at 13-16.  It argues that, because the IBM-3Com cross-licensing agreement was "broad" and encompassed the entirety of each company's portfolio of patents, it would have been unreasonable for 3Com to monitor IBM's large number of products to determine which infringed the patents-in-suit.  It contends that IBM-3Com agreement did not have "any relationship to the patents at issue" here and that there is

---

In their opening brief, Movants made clear that they based their arguments in part on IBM's sale of its own licensed computers that were built with accused Intel components, not simply on IBM's "sale of accused Intel chips," as USEI argues. Mot. for Leave to File a Notice and Surreply, Docket No. 823, 2 n.1; see, e.g., Mot. at 3 (arguing that "IBM purchased more than 25 million Intel components now accused of infringement for inclusion in IBM's licensed products").  Thus, USEI could have responded to this argument in its opposition brief.  Further, even if USEI misunderstood the argument at the time that it filed its opposition, it had ample opportunity to present any further response on this issue at the hearing.

Nonetheless, because the Court has considered the arguments raised by USEI in its proposed surreply and has not found them meritorious, the Court GRANTS it leave to file the surreply.

no evidence that 3Com suspected that IBM was selling products that infringed any of these patents.

However, here, the evidence does not support that 3Com made reasonable efforts to ensure that IBM marked any licensed products with the patents-in-suit.  In fact, the evidence offered shows that 3Com took no steps whatsoever to do so.  Even if it would have been burdensome for 3Com to monitor whether IBM was in fact marking all products practicing the patents, 3Com failed even to include in the licensing agreement an obligation that IBM itself make efforts to mark any products that it reasonably believed practiced 3Com's patents.[8]  It instead authorized IBM to practice the patents-in-suit without any requirement that IBM even make a minimal effort to mark them.  3Com could reasonably have taken such a step without first knowing itself that IBM was making products that practiced its patents, given that 3Com was authorizing IBM to do so.[9]  USEI's argument that the licensing

---

[8] The Court also notes that, although USEI contends that it would have been unreasonable to expect 3Com to investigate fully which IBM products practiced each of 3Com's patents in order to monitor compliance and to know which products had to be marked with the patents-in-suit, 3Com would simply have had to conduct the same type of investigation that USEI was required to conduct for the accused products in this suit.

[9] Movants have offered some evidence that 3Com did in fact have such knowledge.  Notably, in an August 1999 Form 10-K filed with the Securities Exchange Commission, 3Com wrote that "we derive a significant portion of our personal connectivity product sales from PC OEMs, such as . . . IBM, who incorporate our [Network Interface Cards], analog modems, or chipsets into their products."  Constant Decl., Ex. A.16.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

agreement had no relationship to the patents-in-suit is
unavailing.  Although the agreement did not specifically identify
certain patents by number, and the parties did not discuss in
their negotiations particular products that would be licensed
under the agreement, the license encompassed 3Com's patents with
an effective filing date prior to June 5, 2005, which includes all
of the patents at issue here.

In addition, USEI provides no authority that supports its
contention that the sale of products under a broad portfolio
license cannot be imputed to the patent holder.[10]  The terms of
§ 287(a) do not contain any such express exemption and instead
apply to any "persons making, offering for sale or selling within
the United States any patented article" under a patentee.  35
U.S.C. § 287(a); see also In re Yarn Processing Patent Validity
Litig., 602 F. Supp. 159, 169 (W.D.N.C. 1984) (this section
"applies to authorizations by patentee of other persons to make

---

In response, USEI asserts that the Form 10-K is not a
"reasonable basis for 3Com to believe that" IBM was infringing the
patents-in-suit.  Opp. at 16 n.42.  However, USEI does not explain
why not.  Further, Movants did not offer this document as evidence
from which 3Com should have learned that IBM was using technology
covered by the patents-in-suit in its products; instead, they
offered it to show that 3Com knew that IBM was doing so.

[10] USEI suggests in its opposition that the court in Clancy
Sys. Int'l v. Symbol Techs., 953 F. Supp. 1170 (D. Colo. 1997),
found that, for a licensee to sell a patented article "for or
under" a patentee, the license must "specifically" permit the
licensee to sell the infringing product, and thus that a "broad
portfolio license" is insufficient.  However, there was no such
discussion or holding in Clancy.  The portion of that opinion that
USEI cites is simply a description of the license agreement at
issue in that case and a recitation of the fact that the patent
owner there admitted that the licensed product infringed the
patent, thereby qualifying as a "patented article" under § 287(a).
Id. at 1173.

United States District Court
For the Northern District of California

and sell patented articles regardless of the particular form these authorizations may take"), <u>cited with approval by</u> <u>Amsted Indus. v. Buckeye Steel Castings Co.</u>, 24 F.3d 178, 185 n.2 (Fed. Cir. 1994). Here, 3Com, as the patentee, granted IBM the right to make and sell products that practice its patents.  Other courts have applied marking requirements in the context of a portfolio license.  <u>See, e.g.</u>, <u>WiAV Solutions LLC v. Motorola, Inc.</u>, 732 F. Supp. 2d 634, 636, 641-43 (E.D. Va. 2010).  Further, to hold otherwise would be inconsistent with the "three related purposes" of the marking statute: "1) helping to avoid innocent infringement . . .;  2) encouraging patentees to give notice to the public that the article is patented . . . ; and 3) aiding the public to identify whether an article is patented . . ." <u>Nike Inc. v. Wal-Mart Stores</u>, 138 F.3d 1437, 1443 (Fed. Cir. 1998).  Section 287(a) penalizes patentees who put into the marketplace--either directly or indirectly, through their failure to take reasonable efforts to police their licensees--unmarked products that do not inform the public that the intellectual property embodied in those products is protected.

The parties also dispute whether the products sold by Intel were subject to the marking requirement due to the 2002 covenant not to sue between Intel and 3Com.  Although USEI contends that the purpose of the covenant not to sue was to obtain "patent peace" and not to grant a license or authorization to make products, courts have previously found that § 287's marking requirement applies to a patentee's authorization of other persons to make and sell patented items in whatever form the authorization was given, "regardless of whether the authorizations are

'settlement agreements,' 'covenants not to sue' or 'licenses.'"
In re Yarn Processing Patent Validity Litig., 602 F. Supp. at 169;
see also De Forest Radio Tel. Co. v. United States, 273 U.S. 236
(1927) ("As a license passes no interest in the monopoly, it has
been described as a mere waiver of the right to sue by the
patentee") (internal quotation marks and citation omitted);
TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d
1271, 1275 (Fed. Cir. 2009) (stating that "this court and its
predecessors have on numerous occasions explained that a non-
exclusive patent license is equivalent to a covenant not to sue"
and collecting cases).

USEI also argues that the covenant not to sue should not be
read as such an authorization because 3Com did not grant Intel the
rights to practice the patents-in-suit under the restrictive
cross-license that they entered at the same time as the covenant
not to sue.  In support of its argument, USEI relies on Phillip M.
Adams & Assocs., LLC v. Winbond Elecs. Corp., 2010 U.S. Dist.
LEXIS 93799 (D. Utah), in which the district court considered a
licensing agreement that contained a covenant not to sue and
addressed whether it authorized the sale of particular products,
which were not encompassed in the express license, as "for or
under the" patentee pursuant to § 287.  The court found that, to
read the covenant not to sue as granting an implied license as to
all matters covered in that covenant would render all of the
limitations in the express license "surplusage, an impermissible
result under California law." Id. at 29-30.  Thus, the court
concluded that the products sales could not be imputed to the
patentee for the purposes of the marking statute.  Id. at 30.

20

United States District Court
For the Northern District of California

1    However, USEI fails to demonstrate that the separate cross

2    license and covenant not to sue at issue here are the equivalent

3    of those analyzed by in the Adams case or that reading of the

4    covenant not to sue as an implied license in this case would

5    render any part of the cross license as surplusage.  Unlike in

6    Adams, the documents here are separate contracts that involve

7    different parties.  As explained above, to resolve the Xircom

8    litigation, Xircom, 3Com and Intel contemporaneously entered into

9    a series of contracts.  The settlement agreement was signed by all

10   three and had the other two contracts attached to it.  The cross

11   license was also executed by all three and involved only Xircom

12   and 3Com patents, among other things, granting Xircom and Intel

13   the right to use five specific 3Com patents that are not at issue

14   in this litigation.  Cross License Agreement §§ 1.6, 3.3, 3.4.  In

15   contrast, the covenant not to sue was executed only by Intel and

16   3Com.  In that document, each of these companies agreed not to

17   assert any of their patents against each other alleging

18   infringement of the subject matter covered by the agreement.

19   Covenant Not to Sue § 3.2.  The covered subject matter is defined

20   broadly and encompasses all products made by the respective

21   companies, with limited exclusions.  Id. at §§ 1.9, 1.10, 1.20,

22   1.21.  Particularly in light of the differing time periods, scope

23   and parties to the agreements, it is not clear that interpreting

24   the covenant not to sue as an authorization to practice the

25   patented technology would have any effect whatsoever on the

26   separate cross license, and USEI has not identified any.

27   Further, reading the document as a whole, the covenant not to

28   sue does unambiguously authorize Intel's manufacture and sale of

**United States District Court**
For the Northern District of California

products under any of 3Com's covered patents, even if the parties did not specifically discuss or know that Intel was practicing the technology of the patents-in-suit at the time of contracting.[11]   In the covenant, 3Com agrees that, for the effective term of the agreement, it "will not Assert any Patent owned by 3Com or as to which 3Com has the right to Assert infringement against Intel or Permitted Assignees, alleging direct or indirect infringement with respect to Covered Intel Subject Matter."  <u>Id.</u> at § 3.2.2.  "This term, without apparent restriction or limitation, thus authorizes all acts that would otherwise be infringements: making, using, offering for sale, selling, or importing."  <u>TransCore</u>, 563 F.3d at 1276.  This is particularly clear because "Covered Intel Subject Matter" encompasses "all products manufactured, imported, sold or offered for sale by or for Intel," with limited exceptions that USEI has not invoked here.  Cross License Agreement §§ 1.9, 1.21; <u>see also</u> <u>id.</u> at § 3.1 (stating the intent of the parties to avoid "patent disputes between themselves as a result of sales of their products").

Accordingly, Intel's sales of purportedly infringing products during the time period covered by the covenant not to sue were carried out under the authority of 3Com and can thus be imputed to 3Com for the purposes of § 287's marking requirement.  As with the IBM agreement, 3Com did not take reasonable efforts--or any efforts whatsoever--to ensure that any sale of products by Intel under this authorization complied with this requirement.  Further,

---

[11] Movants have offered evidence that shows that 3Com was aware that Intel was a "well-positioned competitor" in the relevant technology at this time.  Constant Decl., Ex. A.17, 9.

the number of purportedly infringing components sold by Intel during a one year time period from November 2003 to November 2004 dwarfs, by a factor of almost five, the number of components sold by 3Com for a seven year period through 2004.

To the extent that USEI relies on the district court's denial of the defendant's motion for partial summary judgment based on marking in the Realtek litigation, this is unavailing.  The motion there was brought based on 3Com's purported failure to mark its own products with the patents, not on its failure to make reasonable efforts to ensure that licensees complied with the marking requirements.  Even assuming for the purposes of this motion that 3Com did mark substantially all of its own products and that it made reasonable efforts to ensure that its express licensees, Realtek, ADMtek and VIA, did so, this is not sufficient to preclude summary judgment, in light of the failure to take reasonable steps to ensure that Intel and IBM marked products with the patents.

USEI also argues that the motion should be denied because Movants have not offered evidence that Intel's products infringe the patents-in-suit and instead rely on USEI's assertions of infringement.  It contends that this motion is premature, because some or all of Intel's products may be found ultimately not to infringe and "there would be no reasonable argument that 3Com failed to comply with the marking requirements of Section 287 based on the sale of non-infringing Intel products."  Opp. at 19.  However, as explained by another district court presented with the same argument, this argument is insufficient to raise a genuine issue of material fact:

United States District Court
For the Northern District of California

Loral simply argues that a genuine factual issue remains as to whether the CCDs sold by Toshiba, NEC and the other defendants infringe claims of the '485 patent. Loral contends that this court cannot rule on this motion until the finder of fact rules on infringement. These legal contentions, however, do not satisfy Loral's burden to present factual evidence showing a genuine issue of material fact.

Loral has consistently asserted in this case that the CCDs sold by Matsushita, Toshiba, and NEC in the United States infringe claims of the '485 patent. Defendants have conclusively shown these specific allegedly infringing CCDs were sold, unmarked, during the terms of license agreements with Fairchild. Loral has not withdrawn its claim of infringement of any of these devices. In sum, Loral has provided no evidence to show a genuine issue of material fact. See Fed. R. Civ. P. 56(e).

Rather than supply evidence creating a genuine factual issue, Loral has merely argued the possibility that the trier of fact could find that these CCDs do not infringe -- a position inconsistent with Loral's pleadings, answers to interrogatories, statement of undisputed facts, and its interpretation of the scope of its patent, either literally or by equivalents. Loral cannot create a genuine issue of fact as to whether these licensed CCDs are covered by the '485 patent simply by arguing the possibility of such a result.

Loral Fairchild Corp. v. Victor Co. of Japan, 906 F. Supp. 813, 818 (E.D.N.Y. 1995). Similarly, here, USEI has consistently taken the position that the relevant products sold by Intel infringe its patents, and it has not offered any evidence here that they do not--instead, it just speculates that the factfinder ultimately may find that Intel's products do not infringe. With their motion, Movants offered evidence that the marking requirement was not met and thus the burden shifted to USEI to raise an issue of fact to preclude summary judgment. It cannot meet its burden to do so simply through argument unsupported by evidence.

Further, USEI has raised no genuine issue of material fact that 3Com failed to mark its products with the '313 Patent. With their motion, Movants offered evidence that 3Com did practice the

'313 Patent.  In its infringement contentions, USEI asserted that "its predecessor in interest, 3Com Corporation, practiced [the Asserted Claims] as 3Com was a world-wide leader in Ethernet products until it was forced out of business . . ."  Constant Decl., Ex. A.2, 18.  USEI responds that this statement "falls short of demonstrating that 3Com sold an unmarked products that practiced the '313 Patent."  Opp. at 18, n.49.  However, Movants offered this to show that 3Com did make products that practiced the '313 Patent, and a jury could conclude from this statement that 3Com did this.  Movants also offered testimony from USEI's Rule 30(b)(6) witness that USEI did "not know" if 3Com or anyone else ever marked products with the '313 Patent.  Constant Decl., Ex. A.7, 21:6-14.  Thus, Movants produced evidence that showed that USEI would not able to meet its burden of persuasion at trial to show that the products that 3Com made practicing the '313 Patent were marked.  USEI did not respond with any evidence to demonstrate that there is a genuine issue of fact as to this.[12]

Finally, USEI argues that, even if the Court holds--as it has--that patented products sold by Intel during the term of the covenant not to sue should be imputed to 3Com, "[a]ny limitation on USEI's ability to recover damages for infringement of the Patents-in-Suit under 35 U.S.C. §287 should end on November 8, 2004," the expiration of that covenant.  Opp. at 17-18.  However,

---

[12] In addition, Movants offered evidence that USEI has identified Broadcom's BCM5700 chip of infringing the '313 Patent, see Constant Decl., Ex. A.2, 7; Bremer Reply Decl., Ex. A.2, 7, and that 3Com itself made unmarked products that utilized this chip, see Bremer Reply Decl., Exs. A.3, A.4.  USEI did not address or respond to this evidence at the hearing.

United States District Court
For the Northern District of California

1  this argument fails to take into account that the license

2  agreement with IBM remained valid past that date and that IBM

3  continued to sell unmarked products that included accused Intel

4  components through 2009.

5      Accordingly, the Court GRANTS Movants' motion for partial

6  summary judgment on the basis of marking.  USEI cannot recover

7  damages for any acts of infringement of the '872, '459 or '313

8  Patents against Movants, except ASUS Computer International, that

9  took place before it filed infringement claims against each of

10  them.  Further, USEI cannot recover damages for any acts of

11  infringement of the '313 Patents against ASUS Computer

12  International that took place before USEI filed infringement

13  claims against it.

14  II.  Nominal damages

15      Intel and Nvidia move for summary judgment precluding USEI

16  "from asserting that damages should be calculated by applying a

17  royalty rate or percentage to revenues or profits from the accused

18  products" and limiting USEI "to proffering a reasonable royalty

19  based on the total costs of permanently removing the accused

20  features from the accused products, rather than on any alleged

21  value of the accused features to Intel, Nvidia, or their

22  customers."  Mot. at 20.  They argue that, since before October

23  2003, they have disabled the accused features of their Ethernet

24  products in the software drivers that they provide to purchasers.

25  USEI moves to continue the motion for partial summary judgment

26  pursuant to Federal Rule of Civil Procedure 56(d).

27      Although, if Intel and Nvidia were to prove ultimately that

28  any infringing capabilities of their accused products were in fact

26

1  fully disabled for the damages period, and that the accused

2  features were of no benefit to them or their customers during that

3  time, USEI may be foreclosed from recovering damages as they urge,

4  USEI has identified sufficiently specific evidence that it may

5  obtain through discovery that may be relevant to the issue of

6  disablement, including whether the features may have been re-

7  enabled.  Accordingly, the Court GRANTS USEI's Rule 56(d) motion.

8  The Court DENIES Intel and Nvidia's motion for partial summary

9  judgment without prejudice to re-filing as part of the parties'

10  dispositive cross-motions that are set to be briefed after the

11  close of fact and expert discovery.[13]

12                              CONCLUSION

13      For the reasons set forth above, the Court GRANTS in part and

14  DENIES in part Movants' motion for partial summary judgment

15  (Docket Nos. 766 in 10-3724, 450 in 10-5254), GRANTS USEI's Rule

16  56(d) motion (Docket No. 793), GRANTS USEI leave to file a

17  surreply and DENIES it leaves to file a notice of newly discovered

18  evidence (Docket No. 823).  Within three days of the date of this

19  Order, USEI shall file its proposed surreply in the docket.

20      USEI is precluded from recovering damages for any acts of

21  infringement of the '872, '459 or '313 Patents by Intervenors

22  Intel Corporation, Broadcom Corporation, Marvell Semiconductor

23  Inc., Nvidia Corporation, Atheros Communications Inc. and Sigma

24  Designs, Inc., and Defendants Acer, Inc., Acer America

25  Corporation, Apple, Inc., Asustek Computer Inc., AT&T Services,

26

27  _____

28      [13] USEI's motion for leave to file newly discovered evidence
    regarding disablement is therefore DENIED as moot.

United States District Court
For the Northern District of California

Inc., Dell Inc., Fujitsu Ltd., Fujitsu America, Inc., Gateway, Inc., Hewlett Packard Co., Sony Corporation, Sony Corporation of America, Sony Electronics Inc., Toshiba Corporation, Toshiba America, Inc., or Toshiba America Information Systems, Inc. that took place before it filed infringement claims against such Defendant or Intervenor.  Further, USEI is precluded from recovering damages for any acts of infringement of the '313 Patents against ASUS Computer International that took place before USEI filed infringement claims against it.

IT IS SO ORDERED.

Dated:   8/16/2013

CLAUDIA WILKEN
United States District Judge