Garland T. Stephens, garland.stephens@weil.com
Douglas Wayne McClellan, *pro hac vice*, doug.mcclellan@weil.com
Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1700
Houston, TX 77002
Phone: 713-546-5000 / Fax: 713-224-9511

Jared Bobrow, SBN 133712, jared.bobrow@weil.com
Sonal N. Mehta, SBN 222086, sonal.mehta@weil.com
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Phone: 650-802-3000 / Fax: 650-802-3100

Brian E. Ferguson, *pro hac vice*, brian.ferguson@weil.com
Weil, Gotshal & Manges, LLP
1300 Eye Street NW, Suite 900
Washington, DC 20005-3314
Phone:  202-682-7077

Seth M. Sproul, SBN 217711, sproul@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
Phone: 858-678-5070 / Fax: 858-678-5099

Thad C. Kodish, *pro hac vice,* tkodish@fr.com
Fish & Richardson P.C.
1180 Peachtree Street, N.E., Suite 2100
Atlanta, GA 30309
Phone: 404-892-5005 / Fax: 404-892-5002

Attorneys for Intervenor Intel Corporation

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| U.S. Ethernet Innovations, LLC, <br><br>        Plaintiff, <br>    v. <br><br> Acer, Inc., et al., <br><br>        Defendants. <br>     and <br><br> Atheros Communications, Inc., et al., <br><br>        Intervenors. | Case No. 4:10-cv-03724 CW (LB) <br> Case No. 4:10-cv-05254 CW (LB) <br><br> **INTERVENORS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S DISPOSITIVE MOTIONS** <br><br> **<u>FILED UNDER SEAL</u>** <br><br> Judge: Hon. Claudia Wilken <br> Courtroom: 2, 4th floor <br> Hearing: August 14, at 2:00 p.m. |
| AT&T Mobility, LLC, et al., <br><br>        Defendants. | |

# NOTICE OF MOTION

Please take notice that at 2:00 p.m. on August 14, 2014, or as soon thereafter as the motion can be heard, Defendants and Intervenors (collectively, "Defendants") move for an Order granting: (1) partial summary judgment that USEI cannot meet its burden of proof on damages; (2) partial summary judgment of non-infringement of the 313 patent for all accused products; (3) partial summary judgment that the Intel 82593 anticipates claim 21 of the 872 patent and claims 9, 28, and 39 of the 094 patent; (4) partial summary judgment that the SONIC anticipates the asserted claims of the 872 and 094 patents; (5) partial summary judgment that no party infringes the 459 patent; (6) partial summary judgment that claim 1 of the 459 patent and claim 13 of the 313 patent are indefinite.  Defendant AT&T Services ("ATTS") moves for an Order granting: (7) partial summary judgment USEI cannot collect damages from ATTS.  Intervenor Marvell Semiconductor, Inc. ("MSI") moves for an Order granting: (8) partial summary judgment that MSI is not liable for extraterritorial sales transacted by non-party MAPL.  Defendant Apple Inc. ("Apple") moves for an Order granting: (9) partial summary judgment that Apple does not infringe claims 1, 9, 12, and 28 of the 094 patent. Intervenors Atheros ("Atheros"), Sigma Designs ("Sigma"), and ATTS move for an Order granting: (10) partial summary judgment that Atheros does not infringe claim 1 of the 313 patent and that Sigma and ATTS do not infringe claims 1, 3, 5, 7, 9, 10, 13, 17 and 19 of the 313 patent.

Defendants hereby oppose the following motions for summary judgment: (1) USEI's motion for partial summary judgment that Intel Accused Products literally infringe claim 21 of the 872 patent; (2) USEI's motion for partial summary judgment that Intel's alleged willful copying of the patented technology precludes the application of any equitable defenses; and (3) USEI's motion for partial summary judgment that the 872 and 094 patents are not anticipated by the SONIC prior art device.

Defendants have withdrawn their inequitable conduct claims and on that basis do not oppose the following dispositive motion: (4) USEI's motion for partial summary judgment regarding Defendant's inequitable conduct claims.

# TABLE OF CONTENTS

I.      USEI CANNOT MEET ITS BURDEN OF PROOF ON DAMAGES ..................................1

    A.      USEI's damages theory is not the product of reliable principles and methods that have been reliably applied to the facts ..................................1

        1.      USEI grossly overstates damages by claiming royalties it is not entitled to recover as a matter of law ..................................1

        2.      The features accused of infringing the 872, 094 and 459 patents have not been used during the damages period ..................................4

        3.      Mr. Bratic's damages analysis is not tied to the facts in this case ..................................8

    B.      Conclusion ..................................14

II.     NO ACCUSED PRODUCTS INFRINGE THE 313 PATENT..................................15

    A.      Introduction ..................................15

    B.      Background of the 313 patent ..................................15

    C.      None of the accused products include the claimed "host interface means" of claim 1 ..................................16

        1.      There is no genuine dispute that the accused products require host management of data transfers, and thus do not perform the function of the "host interface means" of claim 1 ..................................16

        2.      The accused products do not include structure corresponding to the claimed "host interface means" of claim 1 ..................................17

    D.      None of the accused products include the claimed "network interface means" ..................................18

    E.      The accused Intel products do not have "a buffer memory outside of the host address space" ..................................19

    F.      For accused Intel and MSI products, Dr. Mitzenmacher identifies different "buffer memories" for different limitations ..................................20

    G.      The accused products do not infringe claim 13 of the 313 patent ..................................20

III.    THE INTEL 82593 PRIOR ART ANTICIPATES CLAIM 21 OF THE 872 PATENT AND CLAIMS 9, 28, AND 39 OF THE 094 PATENT..................................21

        1.      Both sides' experts agree that the 82593 satisfies every limitation of these claims ..................................21

        2.      Intel 82593 is prior art ..................................21

IV.     SONIC ANTICIPATES THE ASSERTED CLAIMS OF THE 872 AND 094 PATENTS ..................................23

V.      NO ACCUSED PRODUCTS INFRINGE THE 459 PATENT..................................23

VI.     313 PATENT CLAIM 13 AND 459 PATENT CLAIM 1 ARE INVALID UNDER §112..................................24

VII.    ATTS'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO DAMAGES, OR ALTERNATIVELY, TO LIMIT THE AT&T ROYALTY BASE..................................25

A.      USEI cannot tie the ATTS royalty base to Sigma chips sold during the damages period, as required. ...................................................................26

B.      Nor can USEI identify any STBs that were the subject of an allegedly infringing act by ATTS during the damages period, as required. .............................28

1.      Purchasing is not infringing; so the alleged ATTS royalty base lacks any infringement basis. ...................................................................28

2.      USEI cannot prove infringing acts by ATTS during the damages period. ...................................................................28

VIII.   MSI'S MOTION FOR PARTIAL SUMMARY JUDGMENT TO EXCLUDE FOREIGN NON-PARTY SALES FROM USEI'S ASSERTED DAMAGES BASE .........29

A.      MSI is not liable for non-party MAPL's activities abroad .......................................30

B.      MAPL's foreign activities cannot give rise to damages in the U.S. ........................30

C.      MSI is not liable for importation or use of non-party MAPL chips by third parties 31

IX.     APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT OF CLAIMS 1, 9, 12, AND 28 OF THE 094 PATENT.......................32

A.      The Sun Ethernet technology in Apple's accused products has never been configured to do early transmit and thus cannot infringe the method claims of the 094 patent ...................................................................32

B.      Conclusion ...................................................................33

X.      ATHEROS'S, SIGMA'S, AND ATTS'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE 313 PATENT...................................33

XI.     THE INTEL PRODUCTS DO NOT INFRINGE CLAIM 21 OF THE 872 PATENT.........34

A.      Response to USEI's alleged uUndisputed material facts...........................................34

B.      Argument ...................................................................34

1.      USEI has failed to meet its burden to prove infringement by failing to identify any specific Intel products or perform a representative product analysis ...................................................................35

2.      USEI has failed to meet its burden to identify any activity by anyone in the United States that constitutes direct infringement under § 271(a) ...................................................................35

3.      The accused products do not include a "buffer memory which stores data of frames composed by a host computer for transmission on the network"...................................................................35

4.      The accused products do not include "logic, coupled to the buffer memory, which monitors the transferring of data of a frame to the buffer memory to make a threshold determination…" ...............................36

5.      The accused products do not include "logic, responsive to the threshold determination of the logic which monitors the transferring of data to the buffer memory, which initiates transmission of the

frame…prior to transfer of all of the data of the frame to the buffer memory" ..................................................................................................... 36

6.    An abstract possibility that accused products could be configured to meet the claim limitations is not enough ....................................... 37

7.    USEI misrepresents the Texas ruling ..................................................... 39

8.    USEI's validity expert testified that claim 21 requires actual use ............... 39

9.    Even under USEI's incorrect view that claim 21 requires only abstract "capability," the accused Intel products do not infringe ............................. 39

XII.    INTEL DID NOT COPY AND DOES NOT HAVE UNCLEAN HANDS ........................ 41

A.    Response to USEI's alleged undisputed material facts .............................. 41

B.    Argument .............................................................................................. 41

1.    There is no nexus between the allegedly copied product and the asserted claims ............................................................................... 42

2.    Intel did not copy any patented "Parallel Tasking" technology ................... 44

3.    Neither Intel nor any other Defendant has engaged in litigation misconduct ........................................................................................ 45

XIII.    SONIC ANTICIPATES THE ASSERTED CLAIMS OF THE 872 AND 094 PATENTS ............................................................................................... 46

A.    Response to USEI's alleged undisputed material facts .............................. 46

B.    Argument .............................................................................................. 46

1.    SONIC discloses each and every element of the asserted claims of the 872 and 094 patents ..................................................................... 46

2.    The asserted claims do not require "a buffer memory capable of storing a full ethernet frame" as USEI argues ......................................... 47

3.    If USEI's Incorrect Claim Construction Were Applied, Then There is At Least a Disputed Issue of Material Fact to Preclude Summary Judgment ........................................................................................... 49

4.    The jury verdicts cited by USEI are irrelevant ......................................... 49

5.    The patent office did not have or consider the material SONIC disclosures ....................................................................................... 50

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*ACCO Brands, Inc. v. ABA Locks Mfr. Co., Ltd.,*
5
    501 F.3d 1307 (Fed. Cir. 2007)..................................................................38

6
*Adobe Sys. v. Wowza Media Sys.,*
    No. 11-cv-02243, 2014 U.S. Dist. LEXIS 23153 (N.D. Cal. Feb. 22, 2014) ..............................38

7
*Allen Archery, Inc. v. Browning Mfg. Co.,*
8
    819 F.2d 1087 (Fed. Cir. 1987)..................................................................50

9
*Alphamed Pharm. Corp. v. Arriva Pharm., Inc.,*
    03-20078-CIV, 2005 WL 5960935 (S.D. Fla. Aug. 24, 2005) ......................................1

10
*Amazon.com, Inc. v. Barnesandnoble.Com, Inc.,*
11
    239 F.3d 1343 (Fed. Cir. 2001)..................................................................42

12
*Aristocrat Techs. v. Int'l Game Tech.,*
    No. C-06-03717, 2010 U.S. Dist. LEXIS 145486 (N.D. Cal. June 15, 2010) ..........................46

13
*Atmel Corp. v. Information Storage Devices, Inc.,*
14
    198 F.3d 1374 (Fed. Cir. 1999)..................................................................25

15
*Ball Aerosol & Spec. Container, Inc. v. Ltd. Brands, Inc.,*
    555 F.3d 984 (Fed. Cir. 2009) ..................................................................38

16
*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,*
17
    1 F.3d 1214 (Fed. Cir. 1993)..................................................................28

18
*Carnegie Mellon University v. Marvell Tech. Group,*
    2013 WL 5332108 (W.D. Pa. Sept. 23, 2013) ..................................................32

19
*DataQuill Ltd. V. High Tech Computer Corp.,*
20
    887 F. Supp. 2d 999 (S.D. Cal. 2010) ..........................................................15

21
*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ..................................................................1

22
*Fantasy Sports Props. v. Sportsline.com, Inc.,*
23
    287 F.3d 1108 (Fed. Cir. 2002) ..................................................................38

24
*Fenner Investments, LTD. v. Hewlett-Packard Co.,*
    6:08-CV-273, 2010 WL 3911372 (E.D. Tex. Apr. 16, 2010)..........................................1

25
*Floyd v. Hefner,*
26
    556 F. Supp. 2d 617 (S.D. Tex. 2008) ..........................................................1

27
*Fluorine On Call, Ltd. v. Fluorogas Ltd.,*
    380 F.3d 849 (5th Cir. 2004)..................................................................1

28

*Fonar Corp. v. Gen. Elec. Co.*,
    107 F.3d 1543 (Fed. Cir. 1997)..................................................................................27

*France Telecom S.A. v. Marvell Semiconductor, Inc.*,
    Case No. 12-cv-04967, 2014 WL 1478850 (N.D. Cal. Apr. 14, 2014) ..........................30, 31, 32

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010)..................................................................................37

*Function Media, L.L.C. v. Google Inc.*,
    2:07-CV-279-CE, 2010 WL 272409 (E.D. Tex. Jan. 15, 2010) .....................................1

*Garretson v. Clark*,
    111 U.S. 120 (1884)..............................................................................................8, 14

*Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*,
    726 F.3d 1370 (Fed. Cir. 2013)..................................................................................22

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075, 219 U.S.P.Q. 679 (Fed. Cir. 1983)......................................................13

*High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.*,
    49 F.3d 1551 (Fed. Cir. 1995)....................................................................................38

*Hilgraeve Corp. v. Symantec Corp.*,
    265 F.3d 1336 (Fed. Cir. 2001)..................................................................................37

*ICU Medical, Inc. v. Rymed Tech., Inc.*,
    752 F.Supp.2d 486 (D. Del. 2010).............................................................................42

*Imperium (IP) Holdings, Inc. v. Apple Inc.*,
    No. No. 4:11-cv-163, 2012 U.S. Dist. LEXIS 185342 (E.D. Tex. July 2, 2012) ............38, 39

*Intel Corp. v. United States Int'l Trade Comm'n*,
    946 F.2d 821 (Fed. Cir. 1991)...............................................................................37, 38

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*,
    4:08-CV-03181, 2010 WL 4065465 (S.D. Tex. Oct. 9, 2010) ......................................1

*Johnson v. Mammoth Recreations, Inc.*,
    975 F.2d 604 (9th Cir. 1992).....................................................................................30

*Johnston v. IVAC Corp.*,
    885 F.2d 1574 (Fed. Cir. 1989)..................................................................................34

*Kearns v. Chrysler Corp.*,
    32 F.3d 1541 (Fed. Cir. 1994)....................................................................................29

*Keplinger v. De Young*,
    23 U.S. 358 (1825)...................................................................................................28

*Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*,
    964 F. Supp. 2d 653 (E.D. Tex. 2013).......................................................................32

*Laserdynamics, Inc. v. Asus Computer Int.*,
    694 F.3d 51 (Fed. Cir. 2012)...............................................................................8, 14, 15

*Leapfrog Enterprises v. Fisher-Price*,
    No. 03-cv-927, 2005 WL 1331216 (D. Del. June 6, 2005).............................................................

*Lucent Technologies Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed Cir. 2009)...................................................................................................8, 10

*Mediatek Inc. v. Freescale Semiconductor, Inc.*,
    No. 11-cv-5341-YGR, 2014 U.S. Dist. LEXIS 31461 (N.D. Cal. Mar. 5, 2014).......................48

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
    134 S. Ct. 843 (2014)..................................................................................................................28

*Mendenhall v. Cedarapids, Inc.*,
    5 F.3d 1557 (Fed. Cir. 1993).......................................................................................................50

*Microsoft Corp. v. AT&T Corp.*,
    550 U.S. 437 (2007)....................................................................................................................31

*Mirror Worlds, LLC v. Apple, Inc.*,
    784 F. Supp. 2d 703 (E.D. Tex. 2011) *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012) ............................1

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
    C 04-2000 CW, Dkt. No. 741 at 20-23 (N.D. Cal. Feb. 8, 2007) ...............................................1

*Nat'l Envelope Corp. v. Am. Pad & Paper Co. of Delaware, Inc.*,
    06 CIV 12988 SHS RLE, 2009 WL 5173920 (S.D.N.Y. Dec. 30, 2009)......................................1

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120, 2014 WL 2440536 (2014) ...............................................................................25

*NetAirus Technologies, LLC v. Apple, Inc.*,
    2013 U.S. Dist. LEXIS 184514 (C.D. Cal. October 23, 2013) ...................................................15

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)....................................................................................................................49

*O2 Micro Int'l. Ltd. v. Monolithic Power Systems, Inc.*,
    2004 U.S. Dist. LEXIS 30244 (N.D. Cal. Feb. 11, 2004)...........................................................34

*Organic Seed Growers & Trade Ass'n v. Monsanto Co.*,
    718 F.3d 1350 (Fed. Cir. 2013)...................................................................................................49

*Phonometrics, Inc. v. Northern Telecom Inc.*,
    133 F.3d 1459 (Fed. Cir. 1998)...................................................................................................23

*Plantronics, Inc. v. Aliph, Inc.*,
    No. 09-01714, 2014 U.S. Dist. LEXIS 24784 (N.D. Cal. Feb. 26, 2014) ...................................38

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348,1371 (Fed. Cir. 2013), *cert. denied*, 2014 WL 102413 (Jan. 13, 2014).........31, 32

*Prasad v. MML Inv. Services, Inc.*,
    No. 04-civ-380, 2004 WL 1151735 (S.D.N.Y. 2004)..................................................................46

*Rembrandt Data Techs., LP v. AOL, LLC*,
    673 F. Supp. 2d 420 (E.D. Va. 2009)..........................................................................................37

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ........................................................ 1, 14, 15

*Riles v. Shell Exploration and Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002) ................................................................ 8

*Tesco Corp. v. Weatherford Int'l Inc.*,
  722 F. Supp. 2d 755 (S.D. Tex. 2010) .................................................... 27

*Typhoon Touch Technologies, Inc. v. Dell, Inc.*,
  659 F.3d 1376 (Fed. Cir. 2011) ......................................................... 38, 39

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ..................................................... 8, 14, 32

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*,
  225 U.S. 604 (1912) ................................................................................ 10

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
  CIV.A. 09-157-RGA, 2013 WL 936449 (D. Del. Mar. 11, 2013) ................. 1

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ................................................................................ 30

**Statutes**

35 U.S.C. §102(a) ........................................................................................ 21

35 U.S.C. §102(b) ................................................................................... 21, 22

35 U.S.C. §112 ...................................................................................... 25, 26

35 U.S.C. § 271(a) ........................................................................... 28, 29, 35

35 U.S.C. § 287(a) ....................................................................................... 26

**Other Authorities**

37 CFR 1.98 ................................................................................................ 50

Fed. R. Evid. 702 .................................................................................... 1, 15

# I.   USEI CANNOT MEET ITS BURDEN OF PROOF ON DAMAGES

## A.   USEI's damages theory is not the product of reliable principles and methods that have been reliably applied to the facts

This Court and many others have excluded USEI's damages expert Walter Bratic's testimony for being based on unreliable methods among other reasons.[1]  In *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.,* C 04-2000 CW, Dkt. No. 741 at 20-23 (N.D. Cal. Feb. 8, 2007), this Court excluded Mr. Bratic's analysis and granted defendants' motion for summary judgment on damages.  In this case, Mr. Bratic has again used unreliable methods, unreasonable inferences, and speculation to reach his damages opinions.  Because his report is not "the product of reliable principles and methods" that have been "reliably applied [] to the facts of the case,"[2] it would not assist the trier of fact to understand the evidence or determine any fact in issue.  The Court should therefore preclude USEI from presenting any testimony from Mr. Bratic.[3]

USEI's damages case is based entirely upon Mr. Bratic's opinions.  USEI therefore cannot meet its burden of proving a reasonable royalty,[4] and the Court should grant summary judgment that USEI cannot prove damages in this case.

### 1.   USEI grossly overstates damages by claiming royalties it is not entitled to recover as a matter of law

***First***, Mr. Bratic includes damages for hundreds of products, totaling sales of more than ▮▮▮▮▮▮, that are not accused of infringement at all.  Mr. Bratic's report for Intel alone lists 143 distinct products for which Mr. Bratic counts sales of ▮▮▮▮▮▮▮▮▮.  Yet only **nine** of

---

[1] *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 861 (5th Cir. 2004); *XpertUniverse, Inc. v. Cisco Sys., Inc.*, CIV.A. 09-157-RGA, 2013 WL 936449 (D. Del. Mar. 11, 2013); *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 727 (E.D. Tex. 2011) *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012); *Fenner Investments, LTD. v. Hewlett-Packard Co.*, 6:08-CV-273, 2010 WL 3911372 (E.D. Tex. Apr. 16, 2010); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 4:08-CV-03181, 2010 WL 4065465 (S.D. Tex. Oct. 9, 2010); *Function Media, L.L.C. v. Google Inc.*, 2:07-CV-279-CE, 2010 WL 272409 (E.D. Tex. Jan. 15, 2010); *Nat'l Envelope Corp. v. Am. Pad & Paper Co. of Delaware, Inc.*, 06 CIV 12988 SHS RLE, 2009 WL 5173920 (S.D.N.Y. Dec. 30, 2009); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 622 (S.D. Tex. 2008); *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 03-20078-CIV, 2005 WL 5960935 (S.D. Fla. Aug. 24, 2005).
[2] Fed. R. Evid. 702.
[3] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-94 (1993).
[4] *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010).  USEI has not advanced any other theory of damages for this case.

Intervenors' and Defs' Motions for Summary
Judgment and Opp. to Plaintiff's Dispositive Motions                1                Case Nos. 4:10-cv-03724 CW (LB)
                                                                                                           4:10-cv-05254 CW (LB)

1   these products are identified as allegedly infringing in Dr. Mitzenmacher's infringement report.[5]

2   This error alone includes more than ▮▮▮▮▮▮▮ of products that are not accused of infringing.

3       With respect to MSI, Mr. Bratic also included over ▮▮▮▮▮▮▮ not alleged to infringe

4   (including the 88E8001, 88E8003, 88E8006, and 88E8010).[6]

5       USEI instructed Mr. Bratic to simply assume that all products for which USEI had financial

6   information infringed the Patents-in-Suit.  Mr. Bratic did nothing to determine whether the products

7   for which he calculated damages are actually accused by USEI or its expert Dr. Mitzenmacher, and

8   Mr. Bratic admitted he could not tell from his own report whether any specific product is actually

9   accused of infringement in the case.[7]

10      **Second**, Mr. Bratic calculated damages for pre-suit sales that violate the Court's Summary

11  Judgment Order on marking.  That Order states that "USEI cannot recover damages for any acts of

12  infringement of the 872, 459 or 313 Patents against Movants, except ASUS Computer International,

13  that took place before it filed infringement claims against each of them."[8]  Yet, for example, Mr.

14  Bratic included ▮▮▮▮▮▮▮▮▮▮ of pre-suit sales of Intel ICH8, ICH9 and ICH10 products,

15  which are accused only on the 313 patent.[9]  Likewise, with respect to MSI, Mr. Bratic included in

16  his report approximately ▮▮▮▮▮▮ of pre-suit sales of products accused of only infringing the

17  313 patent (e.g., 88E8021, 88E8022, 88E8036, 88E8038, 88E8039, 88E8050, 88E8052, 88E8053,

18  88E8061, and 88E8062).[10]  Mr. Bratic admitted he made no attempt to account for marking and

19  conceded he should have excluded products affected by the Order from his reports.[11]

---

[5] Declaration of Justin Constant ("C.Decl.") Ex. 1 (Chart showing products identified in Bratic's Exhibit J2 for Intel and allegedly infringing products from Mitzenmacher's Exhibit C for Intel). After the close of expert discovery, USEI emailed "supplemental" damages reports and stated it would seek leave of Court to do so.  C.Decl. Ex. 66 (USEI email re: supplemental damages motion). It has never done so.  These untimely and unauthorized "reports" re-labeled many of the non-accused products listed in Mr. Bratic's original report without explanation to conceal that they are not accused by Dr. Mitzenmacher.  They also continue to suffer from the problems identified below.
[6] Declaration of Michael Flynn-O'Brien ("F.Decl.") Ex. 2 (Bratic Rep. Ex. K2).
[7] C.Decl. Ex. 2 at 39:17-23 (Bratic Depo.); *Id.* at 15:8-15, 20:15-21:4, 19:4-24, 27:17-28:2, 40:2-5, 40:24-41:3, 272:17-273:7, 284:13-285:11, 553:4-5, 556:9-13.
[8] Dkt. No. 867 at 26.
[9] *Compare* C.Decl. Ex. 8 (Mitzenmacher Intel Ex. C, lines ICH8, ICH9 and ICH10) with C.Decl. Ex. 5 (Bratic Intel Ex. J2 at 3,4).
[10] *Compare* F.Decl. Ex. 2 (Bratic Rep. Ex. K2) *with* F.Decl. Ex. 7 (Mitzenmacher Corr. Ex. C).
[11] C.Decl. Ex. 2 at 313:15-19 (Bratic Depo.); *Id.* at 87:18-22, 548:17-23; C.Decl. Ex. 3 at ¶ 146 (Bratic Base Rpt.).

***Third***, Mr. Bratic's calculations include many OEM products that include licensed chips. USEI and 3Com made several license agreements ████████████████████████ ████████████████████████ that preclude any further recovery based on licensed chips.  Mr. Bratic conceded that the royalty base for OEMs should not include licensed products.[12]  Yet when Mr. Bratic did not know whose chip was in an accused product he often included the product anyway.[13]  His analysis thus wrongly sweeps in many products that are licensed, and he provides no reliable way for anyone, let alone the jury, to remove licensed sales from his damages numbers.

***Fourth***, USEI claims damages from Intel during the Intel/3Com Covenant Not to Sue, a period in which USEI has admitted it may not recover.  Mr. Bratic's opinion states that Intel should pay damages from October 9, 2003.[14]  Yet, in response to Intel's RFA No. 118 USEI admits "it is not seeking damages from Intel for sales of Intel products that occurred prior to November 2004."[15]

***Fifth***, Mr. Bratic's damages include large numbers of products in which the accused features cannot function at all, resulting in huge exaggeration of potentially recoverable damages.  The large majority of Intel sales in Mr. Bratic's calculations are multi-function I/O controller hub (ICH) and Peripheral Controller Hub (PCH) chips.[16] These chips provide many functions that are not accused of infringing and have nothing to do with Ethernet, including keyboard, mouse, disk drive, sound, and USB ports.  Some also include integrated Ethernet controllers.  However, it is undisputed that the Ethernet controllers in these chips cannot function at all unless installed in computers with a separate Intel-proprietary Ethernet physical layer interface chip (a "PHY").[17]

Undisputed evidence also establishes that ████████████████████████████████ ██████████████████████████.[18]  They provide non-accused functions for which no PHY chip is required, but their integrated Ethernet controllers cannot function.  These chips are thus incapable of ever infringing any of the Patents-in-Suit under USEI's own infringement theories.  Yet, Mr.

---

[12] *Id*. at 912:2-21; *Id*. at 91:20-92:18.
[13] *Id.* at 91:20-92:9; 925:4-925:16; 851:9-24.
[14] C.Decl. Ex. 4 at fn. 27 (Bratic Intel Rpt.).
[15] C.Decl. Ex. 33 at 8-9 (USEI's Objections and Responses to Intel's 2nd Set of RFAs).
[16] C.Decl. Ex. 5 (Bratic Intel Ex. J2).
[17] C.Decl. Ex. 21 at 246:16-249:9, 247:8-14 (Anzilotti Depo.), Ex. 6 at 259:22-25; 261:12-15 (Mitzenmacher Depo.).
[18] C.Decl. Ex. 9 at ¶ 168 (Hall Rpt.).

Bratic's damages calculus includes **all** sales of the accused Intel ICHs and PCHs.[19]

## 2. The features accused of infringing the 872, 094 and 459 patents have not been used during the damages period

At the June 27, 2013 summary judgment hearing, counsel for Intel anticipated that USEI would seek very large damages for obsolete and unused features and asked for guidance:

> [W]hat we're asking for is guidance from the Court that if they put in an expert report a year from now that says that they're entitled to, let's say, a billion dollars on features that have been turned off in software through the entire damages period, that they will – they do so at their own risk, that they need put in something other than that if the facts ultimately show that these have been disabled in software throughout the damages period [and] that they won't be able to go forward at trial with that sort of testimony.[20]

The Court responded "I think that's probably true." *Id.* Later, the Court issued an Order providing that, if Intel showed that "any infringing capabilities of their accused products were in fact fully disabled for the damages period, and that the accused features were of no benefit to them or their customers during that time, USEI may be foreclosed from recovering damages as they urge."[21] Thus, USEI has been on notice for more than a year that it would need evidence that the accused features were enabled or benefited customers.

Fact discovery is now closed. And the uncontroverted evidence shows that Intel disabled the features accused of infringing the 872, 094 and 459 patents long before the damages period in this case and that likewise the default operation of all MSI's accused products disables the features accused of infringing the 872 and 094 patents. USEI has failed to proffer any contrary evidence.

### a. The accused features have been disabled throughout the damages period

**Intel 10/100 Products:** In 1998, Intel disabled the Early Receive Interrupt accused of infringing the 459 patent in the driver software Intel provides to its customers for all accused products and never re-enabled it because the feature interrupted the processor so often that it caused performance problems.[22] 3Com removed the feature from its own products for the same reason.[23]

---

[19] C.Decl. Ex. 2 at 39:17-23 (Bratic Depo.). These also include ICHs that do not include Ethernet controllers at all.
[20] C.Decl. Ex. 41 at 28:1-11 (June 27, 2013 Hearing Tr.).
[21] Dkt. 867 at 26-27.
[22] C.Decl. Ex. 24 at ¶¶ 7, 8 (Brandeburg Decl.).
[23] C.Decl. Ex. 20 at 237:11-13 (Baker Depo.).

1   Users cannot re-enable the accused feature with Intel drivers.[24]

2       **Intel 8254x Gigabit Products:** In 2001, Intel issued an erratum announcing that the "Early

3   Transmit" feature accused of infringing the 872 and 094 patents was broken and would not be fixed.

4   The erratum says "With the feature enabled [the product] may lock up or exhibit other problems;

5   insignificant performance gains were observed….  Do not use the early transmit function….  Intel

6   does not plan to resolve this erratum…. Documentation will change to remove text referring to this

7   feature and its associated registers."[25]  Intel driver software does not provide the ability to enable

8   the "Early Transmit" feature,[26] and Intel's public documentation does not provide enough

9   information to enable an individual to write their own driver code to use the feature.[27]

10  ██████████████████████████████████████████████████████████████████

11  ████████████████████████[28]████████████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████████

15  ███████████████[30]

16      **MSI Yukon Products:** The accused MSI Yukon products likewise ███████████████

17  ████████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████

22

23  _____

24  [24] C.Decl. Ex. 24 at ¶ 13 (Brandeburg Decl.).
    [25] C.Decl. Ex. 26 at ¶¶ 5-7 (Carkin August 23, 2013 Decl.).

25  [26] Conover Decl. at ¶¶ 24-31.
    [27] C.Decl. Ex. 25 at 139:1-13 (Carkin Depo.)

26  [28] Carkin Decl. 26 at ¶¶ 5-6 (Carkin August 23, 2013 Decl.); C.Decl. Ex. 25 at 39:13-24, 204:24-
    206:9 (Carkin Depo.).

27  [29] *Id.*; C.Decl. Ex. 25 at 138:11-22 (Carkin Depo.)
    [30] C.Decl. Ex. 25 at 139:1-13 (Carkin Depo.)

28  [31] F.Decl. Ex. 8 at 481:2-482: 23 (Mitzenmacher Depo.); F.Decl. Ex. 9 at 61:12-61:21, 66:2-67:22
    (Kunz Depo.); Kunz Decl. ¶¶ 13-15.

1

2

**Intel 10/100 Products:** In 2002, in response to customer complaints, Intel disabled the "Transmit Threshold" features accused of infringing the 872 and 094 patents by default in driver software Intel provides to its customers for the accused products, and never re-enabled it.[34]  Intel also used the "clobber bit" to disable the feature on systems that might have previously enabled it whenever drivers were updated.[35]  Although a sophisticated user who was aware of this feature could theoretically re-enable it by changing adapter settings in the operating system, Intel did not intend for or tell users to re-enable the transmit threshold.[36]  The Transmit Threshold feature remained disabled in all versions of Intel's Windows drivers Intel provided to its customers.[37]

### b.   USEI cannot identify anyone who has used the accused features during the damages period

USEI has identified no evidence that anyone used any feature accused of infringing the 872, 094 or 459 patents during the damages period in the United States.  Dr. Mitzenmacher could not identify even a single computer that did an early transmit using an accused Intel component after October 2003.[38]  Likewise, Dr. Mitzenmacher has not identified a single computer in the United States that did an early transmit using an accused MSI component.[39]

Dr. Mitzenmacher's infringement report claims without support that "I have additionally reviewed many driver files, created by Intel, that have been widely distributed on millions of Microsoft Windows disks, that contain threshold values that constitute use of early transmits."[40]  In his deposition, however, Dr. Mitzenmacher admitted that he had not actually identified even a single such disk, or any person who had ever used such a disk to enable the accused features.[41]

The sole evidence Dr. Mitzenmacher relied upon for his inaccurate claim concerning

---

[32] F.Decl. Ex.9 at 55:9-16, 57:11-17, 65:7-25 (Kunz Depo.); Kunz Decl. ¶¶ 16-18.
[33] *Id.*; *see also* F.Decl. Ex. 9 at 58:16-59:16, 84:16-85:20 (Kunz Depo.).
[34] C.Decl. Ex. 32 at ¶ 1-18 (Sharoni Decl.).
[35] C.Decl. Ex. 27 at 38:8-38:16 (Conover Depo.)
[36] C.Decl. Ex. 32 at ¶ 19 (Sharoni Decl.).
[37] Conover Decl. at ¶¶ 8-9.
[38] *Id.* at 55:15-21; 232:2-17; 258:23-259:2; 55:15-56:18.
[39] F.Decl. Ex. 6 at ¶ 49 (Mitzenmacher Marvell Rpt.); Ex. 8 at 542:6-552:7 (Mitzenmacher Depo.).
[40] C.Decl. Ex. 53 at ¶41 (Mitzenmacher Intel Base Rpt.).

Windows disks were two configuration files.[42]  But in his deposition, he admitted that he had not identified any Windows disks containing either file.[43]  Dr. Mitzenmacher also could not identify any computer that ***could*** actually use either file, and made no attempt to try them in any computer himself.[44]  The first configuration file is from before 2000.  It is specific to an Acer computer sold before 2000 that is not part of this case.[45]  Dr. Mitzenmacher offered no reason to believe anyone has used it during the damages period.  The other configuration file also will not work with any computer accused in this case.[46]  It will only work in Itanium computers with 10/100 controllers.[47] Itanium computers were very low-volume, high-performance processors used in very expensive servers.[48]  Itanium drivers are not included with normal versions of Microsoft Windows.[49]  Dr. Mitzenmacher conceded in his deposition that he does not claim that this file was distributed on any disks, much less millions.[50]

The sole evidence Dr. Mitzenmacher relies upon in support of his contention that the accused Early Transmit feature may have been used at any time in Marvell products is ████ ████████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████.[51]  Neither provides evidence of use in the United States.  It is undisputed that the Marvell testing to which Dr. Mitzenmacher refers was performed by ████████████████████████████████ in Germany and that the only evidence presented of ████████████████████████████████ in Japan.[52] And as to the latter, the evidence further shows that ████████████████████████████████ asked Marvell to create a new driver to ensure the accused features could not be accessed or used.[53]

---

[41] C.Decl. Ex. 6 at 234:3-22 (Mitzenmacher Depo.).

[42] *Id.* at 230:25-231:8; Conover Decl. at ¶¶ 14-23.

[43] C.Decl. Ex. 6 at 232:2-4 (Mitzenmacher Depo.).

[44] C.Decl. Ex. 6 at 226:10-228:17; 230:10-16 (Mitzenmacher Depo.).

[45] Sproul Decl. at ¶ 2.

[46] Sproul Decl. at ¶ 3

[47] Conover Decl. at ¶ 20 ("[T]he Itanium INF will not install on a non-Itanium system.").

[48] Conover Decl. at ¶ 19.

[49] Conover Decl. at ¶ 22.

[50] C.Decl. Ex. 6 at 233:2-10 (Mitzenmacher Depo.).

[51] F.Decl. Ex. 6 at ¶ 49 (Mitzenmacher Marvell Rpt.), Ex. 8 at 542:6-552:7 (Mitzenmacher Depo.).

[52] Kunz Decl. ¶ 10-12, Ex. 1; F.Decl.9 at 90:22-91:4, 38:5-9 (Kunz Depo.); F.Decl. Ex. 8 at 543:16-544:24 551:17-552:7, 546:13-550:14 (Mitzenmacher Depo.).

[53] Kunz Decl. ¶ 18, Ex. 1; F.Decl. Ex. 9 at 84:16-85:20 (Kunz Depo.).

USEI also has no evidence that anyone has ever enabled or used the "Early Receive Interrupt" feature accused of infringing the 459 patent in the United States during the damages period. Dr. Mitzenmacher admitted that the sole evidence of any actual use of accused features identified in his report concerns testing by Intel engineers mentioned in a single paragraph of his report done by Intel engineers Jesse Brandeburg, Itamar Sharoni, and Reid Kells.[54] Mr. Brandeburg testified that he tested the feature in 1998 and then removed support for it in driver software so that the feature could no longer be used.[55] The testimony Dr. Mitzenmacher cites of Mr. Kells and Mr. Sharoni concerns an entirely different feature that is not even accused of infringing the 459 patent.[56]

Given the Court's previous guidance on this issue, USEI should be precluded from recovering damages for alleged infringement of the 872, 094 and 459 patents.

Further, the lack of use of the accused features establishes that they were of no benefit and removing them would have had no commercial consequences. As discussed below, Mr. Bratic conceded that he was not aware of any such consequences. USEI's claims for hundreds of millions of dollars for these features is thus untenable as a matter of law.

### 3. Mr. Bratic's damages analysis is not tied to the facts in this case

*First*, USEI's damages theory is unrelated to any alleged benefit attributable to any of the Patents-in-Suit.[57] Mr. Bratic could not identify any commercial effects of simply removing the accused features.[58] Instead, he claimed that Dr. Mitzenmacher did not know of any non-infringing alternative "which would have provided the same or similar functionality and benefits taught by the

---

[54] C.Decl. Ex. 6 at 220:23-221:11 (Mitzenmacher Depo.).

[55] C.Decl. Ex. 23 at 56:7-12; 125:5-126:11; 127:2-10 (Brandeburg Depo.); see also C.Decl. Ex. 24 at ¶¶ 7-8, 12 (Brandeburg Decl.).

[56] C.Decl. Ex. 53 at ¶ 63 (Mitzenmacher Intel Base Rpt.), Ex. 23 at 36-38 (Brandeburg Depo.), Ex. 29 at 21-21, 95 (Kells Depo.), Ex. 31 at 30 and throughout (Sharoni Depo.).

[57] A hypothetical licensee would pay only for the value of the patented invention. *Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002). Reasonable royalty damages must be tied to the value of the feature covered by an asserted patent, as distinct from unpatented features. *Garretson v. Clark*, 111 U.S. 120, 121 (1884); *see also Laserdynamics, Inc. v. Asus Computer Int.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *See Lucent*, 580 F.3d at 1332-33 (noting that "most of the realizable profit must be credited to non-patented elements," and that "an invention used frequently is generally more valuable than a comparable invention used infrequently").

[58] C.Decl. Ex. 2 at 202:1-6 (Bratic Depo.)

Intervenors' and Defs' Motions for Summary
Judgment and Opp. to Plaintiff's Dispositive Motions
8
Case Nos. 4:10-cv-03724 CW (LB)
4:10-cv-05254 CW (LB)

Patents-in-Suit."[59]  Dr. Mitzenmacher, however, conceded that Ethernet adapters work "just fine" at any speed without the accused features.[60]  The inventors also all agreed that the patents in suit are not necessary to make Ethernet adapters that work at any speed.[61]  There is no genuine dispute that the accused features could simply have been removed with no commercial effects whatever.

The evidence Mr. Bratic cites of benefits provided by the patents concerns 3Com products dating to 1997 or earlier – too far removed from the damages period (which begins in late 2003 at the earliest) to be probative.[62]  Further, neither USEI nor any of its experts have ever identified any asserted claim practiced by any 3Com product.  Without any nexus between 3Com products and the asserted claims, the Patent Local Rules preclude USEI from relying on 3Com products to support the allegation that the patented technology provides any benefits.[63]

Mr. Bratic made no effort to quantify any benefits of the Patents-in-Suit.[64]  Dr. Mitzenmacher could not show any benefits for the accused products because he did not identify any accused product in which the accused features had ever been enabled, and did not conduct any product testing to determine if any accused product could have received any benefits even if the features had been enabled.[65]  The only indications in Dr. Mitzenmacher's reports of any alleged benefits concern products with no nexus to any asserted claims.[66]  USEI therefore has no admissible evidence concerning any measurable benefits attributable to any of the asserted claims.

Mr. Bratic did not know and did not believe it mattered whether the features accused of infringing the Patents-in-Suit were actually used by anyone.[67]  Mr. Bratic did not believe that even the inability to use an accused functionality affected the benefit received in any way.[68]  As discussed

---

[59] C.Decl. Ex. 3 at ¶ 134 (Bratic Base Rpt.), Ex. 2 at 676:16-698:1; 699:5-18 (Bratic Depo.).
[60] C.Decl. Ex. 6 at 294:18-24 (Mitzenmacher Depo.)
[61] C.Decl. Ex. 18 at 113:14-114:12, 246:24-247:6 (Petersen Depo.); C.Decl. Ex. 17 at 30:1-25; 31:15-19 (Sherer Depo.); C.Decl. Ex. 15 at 32:14-18; 33:11-18 (Brown Depo.).
[62] C.Decl. Ex. 3 at ¶ 117 (Bratic Base Rpt.).
[63] *See* Patent L.R. 3-1(g).
[64] C.Decl. Ex. 2 at 676:9-18, 679:22-680:5 (Bratic Depo.).
[65] C.Decl. Ex. 6 at 69:9-12, 56:13-57:11, 79:8-17 (Mitzenmacher Depo.).
[66] C.Decl. Ex. 53 at ¶ 30, fn. 8 (Mitzenmacher Intel Base Rpt.); C.Decl. Ex. 10 at 164:5-14; 166:5-24 (Conte Depo.).
[67] C.Decl. Ex. 2 at 72:10-15 (Bratic Depo.) *Id.* at 606:12-17; 610:15-21, 611:20-612:19, 711:21-712:16 (Bratic Depo.).
[68] C.Decl. Ex. 2 at 73:12-15 (Bratic Depo.).

above, Intel and Marvell disabled the features accused on the 872, 094 and 459 patents before the damages period, and the majority of accused Intel products could not be used for Ethernet at all, showing that these accused features provided no benefits.[69]

For OEMs, Mr. Bratic similarly calculated damages on all wired computing products without regard to whether anyone had ever practiced the claims of the Patents-in-Suit with the OEM product.[70]  It simply was not "important" to Mr. Bratic's damages calculation whether any user of any product had ever used any of the functionality claimed by the Patents-in-Suit.[71]

Mr. Bratic's failure to account for the lack of use of the accused features is a deviation from accepted *Georgia-Pacific* analysis.  As held in *Lucent Technologies Inc. v. Gateway, Inc*., 580 F.3d 1301, 1333 (Fed Cir. 2009), *Georgia-Pacific* factor 11 requires an analysis of the extent to which the accused infringer has made use of the claimed invention.  Factor 11 informs the court and the jury how the parties would have valued the patented feature during the hypothetical negotiation.[72] Mr. Bratic's disregard of Georgia-Pacific factor 11 is fatal to the admissibility of his opinions.[73]

*Second*, Mr. Bratic fails to determine the value attributable to each Patent-in-Suit and to apportion royalties accordingly.[74]  Mr. Bratic asserts that the royalty to one or all of the Patents-in-Suit would be the same because "Based on my interviews of Dr. Mitzenmacher, I understand that the Patents-in-Suit contain the same specification, and therefore, provided similar functionalities and benefits."[75]  However, nothing in Dr. Mitzenmacher's report supports Mr. Bratic's claim.  Dr. Mitzenmacher testified the claims all differ in scope, and that he accuses different products under different patents, because the patents cover different things.[76]  He also admitted the patents include different specifications.[77]  Dr. Mitzenmacher's testimony thus contradicts Mr. Bratic's opinions.

*Third*, Mr. Bratic ignores the striking evolution of technology over time to draw the unreasonable inference that the parties would agree to pay a fixed per unit royalty for the life of the

---

[69] *See supra* § 2.a.
[70] C.Decl. Ex. 2 at 604:10-21 (Bratic Depo.); *See also id*. at 605:12-19; 611:20-612:19.
[71] C.Decl. Ex. 2 at 606-612 (Bratic Depo.).
[72] *Lucent Technologies*, 580 F.3d at 1333-34.
[73] *Id*.
[74] *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 614-15 (1912).
[75] C.Decl. Ex. 3 at ¶ 146 (Bratic Base Rpt.).
[76] C.Decl. Ex. 6 at 841:9-16 , 853:4-16 (Mitzenmacher Depo.).

1   patents.  Hypothetical negotiation dates range from 1997 to 2008.[78]  Yet Mr. Bratic treats the date of

2   the hypothetical negotiation as irrelevant to the analysis of the reasonable royalty rate.[79]

3          Technological developments through the 1990s and 2000s substantially reduced any

4   potential benefits of the Patents-in-Suit.  Inventor Paul Sherer (3Com's former Chief Technology

5   Officer ) testified that the benefits of the technology in gigabit and 100 megabit products using

6   Internet protocol would be "*negligible*."[80]  Co-inventor Brian Petersen agreed, stating that benefits

7   "diminish significantly," "roughly in proportion to the network speed," and that you can "build a

8   simpler product that still has… very good performance."[81]  He testified "[a]s buses got faster,

9   protocols moved to bursting, the benefits diminished rapidly."[82]  Richard Baker, former Director of

10  IP Licensing at 3Com, also explained that ██████████████████████████████████████████

11  ████████████████████████████████████████████████[83]

12         There is no genuine dispute that the value of the accused technology shrank over time, a

13  critical fact that Mr. Bratic's opinions unreasonably entirely ignore.

14         **Fourth**, Mr. Bratic's claim for up to $260 million from Intel alone is grossly excessive in

15  view of uncontroverted evidence as to the overall value of the Patents-in-Suit.  3Com later sold the

16  Patents-in-Suit, along with many others, to USEI's parent Parallel Technology for ████████████

17  ████████████████████████████████████████████████████████████████

18  ███████████   █████████████████████████████████████████████████

19  ████████████████████████████████████████████

20         **Fifth**, Mr. Bratic's sole evidence for USEI's proposed $0.25 per unit royalty rate is

21  inadmissible and unreliable.  Mr. Bratic relies upon agreements between 3Com and chip makers

22

23

---

24  [77] *Id.* at 847:8-849:20, 851:3-852:7.
    [78] C.Decl. Ex. 2 at 629:3-630:08 (Bratic Depo.).
25  [79] *Id*. at 629:13-630:17, 351:4-8 (Bratic Depo.)
    [80] C.Decl. Ex. 17 at 122:18-123:10, 125:12-19; 126:4-12; 290:22-291:2 (Sherer Depo.).
26  [81] C.Decl. Ex. 18 at 270:23-271:20 (Petersen Depo.).
    [82] C.Decl. Ex. 18 at 135:25-136:13 (Petersen Depo.).
27  [83] C.Decl. Ex. 20 at 237:11-13 (Baker Depo.).
    [84] C.Decl. Ex. 34 (3COMEP003_0008976-998).
28  [85] C.Decl. Ex. 35 (3COMUSEI_0540910).
    [86] C.Decl. Ex. 9 at ¶ 211 (Hall Rpt.).

1  ██████████████[87] These agreements are inadmissible because they were made to settle pending

2  litigation (thus unreliable under Mr. Bratic's own criteria). ████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████. In early June, 2003, ████████ settled its ████████ liability with 3Com,

5  signing the license on which Mr. Bratic relies, which includes provisions releasing ████████ prior

6  sales to ████████ and allowing ███████

7  ████████████████████████████████.[89] On October 19, 2004, with the D-Link case still

8  pending, ████ settled with 3Com, ████████████████████████████████.[90]

    In addition to being inadmissible, the agreements are unreliable because they were

10 manipulated to support an unrealistic damages position by reciting an "undiscounted" $0.25 royalty

11 that no one ever agreed to pay. Mr. Bratic admitted that no chip maker, including ████████████,

12 ever actually agreed to pay a royalty over ████.[91] The agreements could have recited any

13 undiscounted "royalty rate" 3Com desired, and that rate would be irrelevant without evidence that

14 ██████████████ actually agreed to pay the undiscounted rate. Mr. Bratic provides none.

15     Mr. Bratic acknowledges that settlements in the context of litigation are not reliable guides

16 for reasonable royalties but they are his sole source for his $0.25 rate.[92]

17     **Sixth,** Mr. Bratic relies on inadmissible unsigned draft license agreements to reach his

18 conclusions. Mr. Bratic relies on an inadmissible unsigned draft agreement between USEI ████

19 ██████, which lists a royalty of ████ for his conclusion that the OEM Defendants would have

20

---

21 [87] C.Decl. Ex. 3 at ¶ 46 (Bratic Base Rpt.)
   [88] C.Decl. Ex. 36 at (3COMUSEI-0503965).

22 [89] C.Decl. Ex. 65 (3COMUSEI-0159020 at 0159027, 0159030).

23 [90] C.Decl. Ex. 64 (3COMUSEI-0131785 at 0131786-787), Ex. 63 (3COMUSEI-0131766 at 0131779).

24 [91] C.Decl. Ex. 2 at 47:1-23 (Bratic Depo.); C.Decl. Ex. 3 at ¶¶ 90, 163 (Bratic Base Rpt.). Mr. Bratic also cites settlement agreements between USEI and ████████████████ as "confirming"

25 that the $0.25 rate was reasonable. Both of these agreements were also manipulated to show an exaggerated implied royalty by granting a broad release to all accused products while reciting a
   license to only a few products.

26 [92] C.Decl. Ex. 3 at ¶ 84 (Bratic Base Rpt.). "[S]ince the [license] offers were made after the infringement had begun and litigation was threatened or probable, their terms should not be

27 considered evidence of an established royalty, since license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation." *Hanson v.*

28 *Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078–79, 219 U.S.P.Q. 679 (Fed. Cir. 1983).

1  agreed to pay ███ per unit royalty.[93]  No admissible evidence exists that ███ would have

2  agreed to a ███ royalty rate.   For this, Mr. Bratic relies on hearsay from USEI's president David

3  Kennedy—who will make millions if USEI prevails.[94]  Even Mr. Bratic concedes that "███ did

4  not want to pay a royalty higher than ███ per unit."[95]  Yet he concludes based on the draft

5  agreement that the OEM Defendants would have agreed to a rate well in excess of ███.

6         Mr. Bratic also relies heavily on another inadmissible unsigned draft license agreement

7  between 3Com and ███ from 2003 that is full of obvious errors.[96]  Mr. Bratic claims that this

8  constitutes one of the most probative agreements regarding a reasonable royalty in the case[97] and

9  relies on it for USEI's proposed ███ per unit royalty for chip makers.[98]  Yet the document is

10  essentially a copy-and-paste of 3Com's ███ agreement, and was never actually executed.[99]  It

11  contains large swaths of language identical to the ███ agreement and, more importantly, does

12  not even grant ███ a license for its own products.  The obviously erroneous "Licensed Products"

13  section is identical to the ███ license and does not mention ███ products at all.

14         **Seventh,** Mr. Bratic contends that chip makers should pay $0.25 per chip, but their OEM

15  customers would have agreed to pay $1 for the same asserted claims and accused chips.[100]  He also

16  concedes that sales of licensed chips exhaust USEI's rights.[101]  OEMs could thus have bought chips

17  from a licensed chip maker and reimbursed the $0.25 royalty rather than pay USEI $1.

18         Mr. Bratic does not explain this conundrum.  Instead, Mr. Bratic contends "Dell and the

19  other OEM's enjoyed some economic benefit from the patented technology over and above that

20  enjoyed by the chip manufacturers."[102]  Yet neither he nor Dr. Mitzenmacher identifies any such

21  additional benefit.  That is why Mr. Bratic cites to OEM revenues and alleged profitability.[103]  Mr.

22  Bratic was unaware of any evidence that suggests that the patented technology drives the Dell

---

[93] C.Decl. Ex. 3 at ¶ 144 (Bratic Base Rpt.).
[94] *See* C.Decl. Ex. 3 at ¶ 170-171 (Bratic Base Rpt.); *also* Ex. 2 at 228:4-229:10 (Bratic Depo.).
[95] C.Decl. Ex. 3 at ¶ 169 (Bratic Base Rpt.).
[96] C.Decl. Ex. 37 (3COMUSEI-0092620); C.Decl. Ex. 3 at ¶¶ 59-65 (Bratic Base Rpt.).
[97] C.Decl. Ex. 2 at 147:11-21 (Bratic Depo.).
[98] C.Decl. Ex. 3 at ¶ 60 (Bratic Base Rpt.).
[99] *See* C.Decl. Ex. 38 (3COMUSEI-0092496).
[100] C.Decl. Ex. 3 at ¶¶ 164, 171(Bratic Base Rpt.).
[101] C.Decl. Ex. 3 at ¶ 154 (Bratic Base Rpt.).
[102] C.Decl. Ex. 2 at 598:1-8 (Bratic Depo.).

1    revenues.[104]   And he made no attempt to apportion the value of the claimed technology to any Dell

2    product.[105]   Nor has he performed any such analysis for other OEMs.[106]   Mr. Bratic conceded that

3    no evidence exists that Dell has paid a dollar per unit royalty for a product that includes Ethernet

4    technology.[107]   Mr. Bratic thus improperly relies on OEM revenues and profits for his unrealistic $1

5    per unit royalty without apportioning any alleged benefit due to the alleged invention.[108]

6         *Eighth*, Mr. Bratic's damages calculation for the 313 patent is flawed.  The 313 patent is the

7    only patent asserted against Atheros, Sigma, and ATTS and is the sole basis for a large fraction of

8    Mr. Bratic's alleged damages for other parties.  Mr. Bratic points to the ADMtek and VIA licenses

9    as the basis for his 313 royalty calculation.  These licenses, however, did not include the 313 patent.

10   An expert may rely on a license to a non-asserted patent only if the expert establishes that the

11   license is technologically and economically comparable to a hypothetical license to the patent-in-

12   suit.[109]   Mr. Bratic offers no opinion that the ADMtek and VIA licenses are comparable to a

13   hypothetical 313 patent license.  Therefore, Mr. Bratic's damages calculation for Atheros, Sigma

14   and ATTS and for products accused only on the 313 patent should be excluded.[110]

15   **B.    Conclusion**

16        Defendants thus request the Court to find on summary judgment that USEI cannot show

17   damages in this case because the sole basis for its damages claim, Mr. Bratic's expert report and all

18

---

19   [103] *See*, *e.g.*, *id.* at 598:10-12.
     [104] *Id*. at 599.

20   [105] C.Decl. Ex. 2 at 601: 4-8 (Bratic Depo.).
     [106] *Id*. at 611:20-612:19 ("My answers would equally apply to the other OEM defendants.").

21   [107] C.Decl. Ex. 2 at 595:1-4, 595:22-24 (Bratic Depo.).
     [108] *Garretson v. Clark*, 111 U.S. 120, 121 (1884); *see also Laserdynamics, Inc. v. Asus Computer*

22   *Int*., 694 F.3d 51, 67 (Fed. Cir. 2012); *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1318
     (Fed. Cir. 2011).

23   [109] *See ResQNet*, 594 F.3d at 873 (comparisons of past patent licenses to the infringement must
     account for "the technological and economic differences" between them).

24   [110] *See Laserdynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 72-73 (Fed. Cir. 2012)
     (overturning district court's ruling permitting reliance on licensing evidence where "comparability

25   between [licenses] and a hypothetical license to the [patent-in-suit] was missing."); *ResQNet*, 594
     F.3d at 873 (vacating the district court's damages award because the court erroneously considered

26   licenses "without any factual finding that accounted for the technological and economic differences
     between those licenses and the [patent-in-suit].."); *NetAirus Technologies, LLC v. Apple, Inc.*, 2013

27   U.S. Dist. LEXIS 184514, *22-*23 (C.D. Cal. October 23, 2013) (excluding expert testimony
     regarding licenses where expert "[p]resents no analysis of the economic comparability between the

28   licenses discussed and the hypothetical license to the [patent-in-suit]."); *DataQuill Ltd. V. High*

---

1  appendices and exhibits thereto, should be excluded under Fed. R. Evid. 702.

2  **II.     NO ACCUSED PRODUCTS INFRINGE THE 313 PATENT**

3  **A.     Introduction**

4          Claims 1 and 13 are the only asserted independent claims of the 313 patent. USEI's

5  infringement expert admits that every product accused of infringing the 313 patent manages data

6  transfers using a queue of descriptors **managed by the host system** in host memory.[111]  This means

7  that no accused product infringes claim 1 of the 313 patent, as the Court has construed that claim to

8  require "managing data transfers . . . in operations performed **independently of management by**

9  **the host system.**"  Further, USEI's expert reports do not even allege that any accused product

10 includes the structures identified by the Court as corresponding to the "host interface means"

11 limitation of claim 13, or the "network interface means" limitations of claims 1 and 13.  For these

12 and additional reasons discussed below, the Court should grant summary judgment of non-

13 infringement of the 313 patent for all accused products.

14 **B.     Background of the 313 patent**

15         The 313 patent is directed to managing data transfers in a network interface using DMA:

16         Prior art network interface controllers manage this asynchronous interface with the
           use of buffers in host managed memory….. [W]hen the host system transmits data,
17         in prior art systems, it typically writes the data into a host managed transmit buffer
           area, and the network interface controller transfers that data from the host managed
18         space using DMA techniques….Representative prior art systems include … the Intel
           82586 Local Area Network Coprocessor….  It is desirable to provide a network
19         interface controller which minimizes the use of host processor overhead and host
           system bus bandwidth, and simplifies the software executed by the host required for
20         managing the interface.[112]

21         DMA refers to Direct Memory Access, a prior-art technique in which a device independent

22 of the host processor can directly read and write data to and from host memory, so that the host

23 processor does not have to transfer the data itself.[113]  Inventor Paul Sherer explained that both the

24

25 ─────────────────────────────────────────────

26 *Tech Computer Corp.*, 887 F. Supp. 2d 999, 1024-25 (S.D. Cal. 2010) (excluding expert testimony
   for failure to establish economic comparability).
27 [111]  MSI disagrees that the accused ███████████ in its products are the claimed "descriptors," but
   does not contest this for purpose of this motion only.  Kunz Decl. ¶¶ 19-21.
28 [112] C.Decl. Ex. D at 1:21-58 (313 Patent).
   [113] C.Decl. Ex. 6 at 114:8-14 (Mitzenmacher Depo.).

1   patent and prior art manage DMA transfers using "descriptors" that identify data in host memory.[114]

2       Mr. Sherer explained that his invention simplified software for managing data transfers by

3   *eliminating* the need for the host system to write descriptors into queues in host memory[115] (which

4   is the basis on which he distinguished Intel's prior-art 82586 mentioned in the specification).[116]

5   Instead, the host computer would write descriptors directly to the network adapter, which would

6   maintain the descriptor queue outside of host address space, relieving the host system of that duty.

7   The host would not keep a copy of the descriptor in host memory at all.[117]

8       Mr. Sherer said that the patent's reference to "a transmit descriptor ring buffer, transmit data

9   buffer, transfer descriptor buffer, and receive ring buffer all <u>managed in operations transparent to</u>

10  <u>the host</u>" refers to the adapter maintaining descriptor queues, and automatically mapping host writes

11  of descriptors to the device into the appropriate place in the queues outside of host memory.[118]

12  **C.     None of the accused products include the claimed "host interface means" of claim 1**

13      The Court construed the function of the "host interface means" of claim 1 as "managing data

14  transfers between address spaces on the host system bus and the buffer memory in operations

15  performed independently of management by the host system."[119]

16          **1.     There is no genuine dispute that the accused products require host management
                     of data transfers, and thus do not perform the function of the "host interface
17                   means" of claim 1**

18      USEI's infringement expert, Dr. Mitzenmacher, admitted that all of the products accused of

19  infringing the 313 patent manage data transfers by writing descriptors to a queue in host system

20  memory, like the Intel 82586 prior art described in the patent and by Mr. Sherer.[120]

21          Q  Okay, so just to understand, in all of the accused products, first the host writes a
               descriptor into a descriptor queue in host memory, right?
22
            A  Yes.
23
    Dr. Mitzenmacher also admitted that the host processor must write to a different place in the
24

25  _____

    [114] C.Decl. Ex. 17 at 50:13-53:4 (Sherer Depo.).
26  [115] C.Decl. Ex. 17 at 54:3-57:10 (Sherer Depo.).
    [116] C.Decl. Ex. 17 at 75:10-76:20 (Sherer Depo.).
27  [117] C.Decl. Ex. 17 at 60:12-62:21, 75:10-77:6, 86:4-20 (Sherer Depo.).
    [118] C.Decl. Ex. 17 at 77:21-78:24 (Sherer Depo.).
28  [119] Dkt. 586 at 10.
    [120] C.Decl. Ex. 6 at 124:24-125:10 (Mitzenmacher Depo.) (objection omitted).

descriptor queue for consecutive descriptors:

> Q   Okay.  Now, in the products that you've accused of infringement, the processor has to write to a different place in the queue in host memory for consecutive descriptors, right? . . .
>
> THE WITNESS: It does -- I believe it does so, yeah.[121]

The host processor must manage the queue by adjusting the "tail pointer" after writing descriptors to the queue:

> Q   Okay.  But within that fixed area of [host] memory, each descriptor has to be written into the next appropriate location defined by the tail pointer, which is moved by the host after each write, each descriptor write?
>
> A   I believe that's how it would work in normal -- in normal operation.[122]

Dr. Mitzenmacher also admitted that this approach is not what is disclosed in the 313 patent:

> Q   Okay.  But you'd agree there's no description at all in the patent of a transmit descriptor queue in host memory, right?
>
> A   Again, I don't believe so, no.[123]

Because there is no dispute that all accused products require the host system to manage data transfers between the host system and the network adapter with a queue of descriptors in host system memory, none of the accused products are capable of "managing data transfers between address spaces on the host system bus and the buffer memory in operations performed independently of management by the host system" as required by the Court's construction.

###    2.    The accused products do not include structure corresponding to the claimed "host interface means" of claim 1

Because all accused products manage data transfers between the host system and the network adapter using descriptor queues in host memory, an approach not described in any 313 embodiment, no accused product includes the structure of the claimed "host interface means."

The Court construed the structure corresponding to the "host interface means" of claim 1 to be: "'host descriptor logic 150' and 'download DMA logic 151' as shown in Fig. 9, 'transmit descriptor 107' as shown in Fig. 3, 'transfer descriptor logic 108' and 'upload DMA logic 108' as

---

[121] C.Decl. Ex. 6 at 140:19-141:6 (Mitzenmacher Depo.).
[122] C.Decl. Ex. 6 at 147:20-148:1 (Mitzenmacher Depo.).
[123] C.Decl. Ex. 6 at 128:15-20 (Mitzenmacher Depo.).

1    shown in Fig. 3, and the equivalents thereof."[124]  The Court noted that these structures perform the

2    recited function of the host interface means by creating registers for the host system to write

3    descriptors directly to the adapter, and then automatically mapping these writes into the adapter

4    memory independently of management by the host system.[125]  Dr. Mitzenmacher likewise testified

5    that the structures identified by the Court work this way,[126] and that he is not aware of any other

6    structure described in the patent for the host to store descriptors on the adapter.[127]  This is consistent

7    with the specification and the testimony of the inventors, who described the invention as allowing

8    the host to write a descriptor to the adapter and then "forget about it" while the adapter managed the

9    rest of the DMA transfer.[128]

10          As noted above, Dr. Mitzenmacher admitted that for all accused products, the host must

11   write descriptors to the appropriate places in descriptor queues managed in host system memory

12   (rather than directly to a register on the adapter), structures he admits are not disclosed in the patent.

13   There is thus no genuine dispute that the accused products do not include the Host Descriptor Logic

14   150 shown in Figure 9.

15          Dr. Mitzenmacher has not offered any opinion on equivalents.[129]  There is therefore no

16   genuine dispute that the accused products do not include the "host interface means" of claim 1.

17   **D.     None of the accused products include the claimed "network interface means"**

18          The Court construed the structure for the "network interface means" to be "[i]n Figure 3,

19   Network interface logic 104, and its equivalents."[130]  The description quoted by the Court says that

20   the network interface logic 104 includes transmit DMA logic 109 responsive to descriptors stored in

21   the adapter memory 103 for moving data out of the adapter memory to the network transceiver.[131]

22   Dr. Mitzenmacher confirmed that the Court's construction requires logic responsive to descriptors

23

24   _____

[124] Dkt. 634 at 15.
25   [125] Dkt. 634 at 13-15.
     [126] C.Decl. Ex. 6 at 96:11-97:5; 98:13-24; 140:19-141:6 (Mitzenmacher Depo.)
26   [127] C.Decl. Ex. 6 at 118:24-119:15 (Mitzenmacher Depo.).
     [128] C.Decl. Ex. 17 at 62:9-17 (Sherer Depo.); Ex. 18 at 76:21-77:4 (Petersen Depo.).
27   [129] C.Decl. Ex. 6 at 72:1-9 (Mitzenmacher Depo.).
     [130] Dkt. 634 at 17.
28   [131] *Id.*

stored in adapter memory for moving data out of the adapter memory to the network transceiver.[132]

None of the accused products meet this requirement.[133]  Unlike the 313 embodiments, which store data for transmission both (i) in transmit descriptors in the transmit descriptor buffer and (ii) in transmit data buffers, all of the accused products put all data to be transmitted into First-In-First-Out (FIFO) buffers.  Movement of data from the FIFO onto the network is not responsive to transmit descriptors in adapter memory in the accused products.[134]

Dr. Mitzenmacher's reports do not allege that any structure in the accused products is responsive to descriptors stored in adapter memory for moving data out of adapter memory to a network transceiver.  His opinion on this element in his Intel report is only one paragraph:

> Element 1-3 is "network interface means, coupled with the network transceiver, for managing data transfers between the buffer memory and the network transceiver."  As discussed previously, the Court has determined the only structure required for the "network interface means" element is "[n]etwork interface logic" (as shown in Fig. 3 item 104 of the '313 Patent), and its equivalents. The Intel Gigabit products all have network interface logic, which is found in the MAC Core component, which works in conjunction with the DMA block to transfer data from the FIFOs to the PHY and then on to the network.[135]

Likewise, his opinion on this element in his report for MSI consists of a single paragraph, with no mention of any structure in the accused products allegedly responsive to descriptors stored in adapter memory for moving data out of adapter memory to a network transceiver.[136]

Further, Dr. Mitzenmacher offers no opinion that the accused products include any equivalent.[137]  Accordingly, none of the accused products infringe claim 1 for the independent reason that they do not include the claimed "network interface means."

**E.    The accused Intel products do not have "a buffer memory outside of the host address space"**

There is no genuine dispute that the accused Intel products do not have "a buffer memory outside of the host address space." In his infringement report for Intel, Dr. Mitzenmacher identifies

---

[132] C.Decl. Ex. 6 at 163:21-164:13 (Mitzenmacher Depo.).
[133] Kunz Decl. at ¶¶ 19-23; Carkin Decl. at ¶ 7; McCauley Decl. Ex. 1 at ¶¶ 156-169 (Lin Rpt.); Hu Decl. Ex. 1 at ¶¶ 81-91, 152-162 (Lin Rpt. for Sigma).
[134] Kunz Decl. at ¶¶ 19-23; Carkin Decl. at ¶ 7; McCauley Decl. Ex. 1 at ¶¶ 156-169 (Lin Rpt.); Hu Decl. Ex. 1 at ¶¶ 81-91, 152-162 (Lin Rpt. for Sigma).
[135] C.Decl. Ex. 7 at ¶ 239 (Mitzenmacher Intel Rpt.).
[136] F.Decl. Ex. 6 at ¶ 69 (Mitzenmacher Marvell Rpt.), Ex. 8 at 626:12-22 (Mitzenmacher Depo.).

1    FIFOs in the accused Intel products as the alleged "buffer memory outside of the host address

2    space."[138] In the same report, Dr. Mitzenmacher acknowledges that these FIFOs are not outside the

3    host address space, but argues they are not accessible "in normal operation."[139] The claims do not

4    require the buffer memory to be "outside of host address space <u>in normal operation</u>." Since there is

5    no genuine dispute that the buffer memories identified by Dr. Mitzenmacher are not "outside of host

6    address space," they also do not infringe claim 1 for this reason.

7    **F.      For accused Intel and MSI products, Dr. Mitzenmacher identifies different "buffer
            memories" for different limitations**

8

9          The "host interface means" recites "managing data transfers between the host address space

10   and **the** buffer memory," a reference to the "buffer memory outside of the host address space." Yet

11   for all accused Intel products, Dr. Mitzenmacher identifies two different buffer memories for these

12   limitations. He identifies packet buffer data FIFO buffers as the "buffer memory outside the host

13   address space," and transmit and receive descriptor ring buffers as the "buffer memory" of the "host

14   interface means."[140] Similarly, for all accused MSI products, Dr. Mitzenmacher identifies the █████

15   ████████████ as the "buffer memory outside of the host address space" but the ████████████

16   ██████████████████████████████ as the "buffer memory" of the "host

17   interface means."[141] For this independent reason, the Court should grant summary judgment that

18   Intel and MSI do not infringe the 313 patent.

19   **G.     The accused products do not infringe claim 13 of the 313 patent**

20         The Court noted that claim 13 recites three functions for the "host interface means" and

21   identified structures for each, including an XMIT AREA register, transfer descriptor logic, an

22   XFER AREA register, upload logic and an upload DMA module.[142] Dr. Mitzenmacher did not use

23

24   _____

25   [137] C.Decl. Ex. 6 at 72:1-9 (Mitzenmacher Depo.).
     [138] C.Decl. Ex. 7 at ¶ 230 (Mitzenmacher Intel Rpt.).
     [139] C.Decl. Ex. 7 at ¶ 231 (Mitzenmacher Intel Rpt.)

26   [140] C.Decl. Ex. 7 ¶¶ 230, 233 (Mitzenmacher Intel Rpt.).
     [141] F.Decl. Ex. 6 at ¶¶ 61, 62-67. (Mitzenmacher Marvell Rpt.). Dr. Mitzenmacher identifies the

27   ████████████████████████████████████████████████ even though he admits ███████████
     ██████████████████████████████████████████████. *Id.* ¶ 61.

28   [142] Dkt. 634 at 16.

this construction, and applied the construction from claim 1 instead.[143]  Because Dr. Mitzenmacher did not apply the Court's construction of claim 13 to the accused products, USEI cannot carry its burden of proof of infringement and the Court should grant summary judgment of noninfringement.

Even if the construction of claim 1 were correct for claim 13, as shown above, there is no genuine dispute that the accused products do not contain the "host interface means" of claim 1.  The accused products also do not include "buffer memory outside the host address space" or the "network interface means" of claim 13 for the same reasons described above for claim 1.

## III.   THE INTEL 82593 PRIOR ART ANTICIPATES CLAIM 21 OF THE 872 PATENT AND CLAIMS 9, 28, AND 39 OF THE 094 PATENT

Defendants move for partial summary judgment of anticipation based on Intel's prior-art 82593 chip because Intel's and USEI's technical experts agree that it satisfies every limitation of claim 21 of the 872 patent and claims 9, 28, and 39 of the 094 patent.  USEI's only argument is to deny (incorrectly) that the 82593 is prior art.  There is no genuine dispute that the 82593 is prior art under 35 U.S.C. §102(b) because it was reduced to practice and offered for sale in the U.S. more than one year before the earliest filing date of the 872 and 094 patents (July 28, 1992).  The 82593 separately qualifies as prior art under 35 U.S.C. §102(a) because it was "known or used by others in this country … before the invention thereof by the applicant for patent."

### 1.    Both sides' experts agree that the 82593 satisfies every limitation of these claims

Defendants' expert Dr. Wicker served an expert report detailing element-by-element how the 82593 meets every asserted claim limitation in the 872 and 094 patents.[144]  USEI's expert Dr. Conte served a rebuttal report that does not dispute this analysis for the above claims, which he confirmed at his deposition.[145]  The only remaining issue is whether the 82593 is prior art.  It is.

### 2.    Intel 82593 is prior art

The earliest priority date for the 872 and 094 patents is July 28, 1992.  Intel offered the

---

[143] C.Decl. Ex. 53 at ¶ 25 (Mitzenmacher Intel Base Rpt.).
[144] C.Decl. Ex. 14 at ¶¶ 676-746, Exs 10 and 12 (Wicker Rpt.).
[145] C.Decl. Ex. 10 at 78:18-25 (Conte Depo.) (finding no distinctions between the 82593 and 872 claim 21); *Id*. at 104:15 (finding no distinctions between the 82593 and 094 claims 9, 28, and 39).

82593 for sale in the U.S. in May 1991, more than a year earlier.[146]  It is thus §102(b) prior art.

Mike Anzilotti, a retired Intel engineer who oversaw the 82593 development team, testified that it was released and on sale in the U.S. by May of 1991.[147]  Intel's *Microcomputer Solutions* publication states: "The 82593 is available now.  In 1,000-unit quantities, it costs $18.50 each."[148]  This offer was published by Intel in the U.S. by June 30, 1991.[149]  Intel's offer for sale of the 82593 is corroborated by an InfoWorld article published May 1991, stating, "[t]he 82593 Ethernet controller sells for $18.50 in quantities of 1,000," followed by Intel's phone number.[150]  Intel also provided datasheets and functional 82593 samples to customers in the U.S. before July of 1991.[151]

An Intel record shows that "final production units of the Intel 82593 were immediately available to fulfill customer orders" in Intel's warehouse by the week of June 30, 1991, confirming that Intel had reduced it to practice and offered it for sale by that time.[152]  Intel also made a demonstration board in 1991 containing a production version of the 82593 chip for trade shows.[153]

USEI cannot credibly deny that the 82593 is prior art merely because Intel no longer has sales records for it from 23 years ago.[154]  Due to the passage of time, Intel no longer has sales records prior to 1997 for the products involved in this case.[155]  USEI should not be rewarded for the loss of evidence due to the patent owner's unreasonable delay in filing suit for at least 14 years (i.e., from Intel's release of the accused 82557 in 1995 until suit was filed in 2009).[156]

There is no genuine dispute that the 82593 is prior art to the 872 and 094 patents, and the

---

[146] Anzilotti Decl. at ¶¶ 3-4, 6-7; C.Decl. Ex. 21 at 33:6-34:10; 191:22-192:16; 259:14-21 (Anzilotti Depo.); Ex. 14 at ¶¶ 676-677 (Wicker Rpt.).
[147] C.Decl. Ex. 21 at 33:6-34:10 (Anzilotti Depo.) ("my recollection of the release date was, I believe, May of 1991, for the on-sale dates for the 82593"); *Id*. at 191:22-192:16 ("82593 product … went to production in May of 1991"); *Id.* at 259:14-21 ("This [82593] was on sale at that time" on May 20, 1991); *see also id.* at 22:21-23:15; Anzilotti Decl. at ¶ 2.
[148] C.Decl. Ex. 42 at 11 (*Microcomputer Solutions*, July/August 1991, a Publication of Intel Corporation, dated July 23, 1991, DEF_PA00011587-88).
[149] Jones Decl. at ¶ 2.
[150] C.Decl. Ex. 52 (57094DOC001836); Anzilotti Decl. at ¶ 3.
[151] Anzilotti Decl. ¶¶ 2, 4-5.
[152] Anzilotti Decl. at ¶ 7; C.Decl. Ex. 21 at 34:23-35:8; 259:25-262:8 (Anzilotti Depo.); C.Decl. Ex. 58 (57094DOC004150).
[153] Anzilotti Decl. at ¶ 8; C.Decl. Ex. 22 (Anzilotti Depo. Ex. 41), Ex. 21 at 255:15-257:4; 262:24-264:4 (Anzilotti Depo.).
[154] Neither an actual sale nor sales records are required under §102(b).  *See Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*, 726 F.3d 1370, 1374 (Fed. Cir. 2013).
[155] C.Decl. Ex. 28 at 68:21-70:6 (Insley Depo.).

1    Court should hold 872 claim 21 and 094 claims 9, 28, and 39 invalid as a matter of law.[157]

2    **IV.    SONIC ANTICIPATES THE ASSERTED CLAIMS OF THE 872 AND 094 PATENTS**

3           Intel cross moves for summary judgment that the asserted claims of the 872 and 094 patents

4    are anticipated based on the SONIC prior art for the same reasons and evidence outlined in the

5    Defendants' opposition to USEI's Motion on SONIC in Section XIII below.  USEI admits that

6    SONIC is prior art.  Dr. Wicker's invalidity analysis and invalidity claim charts for SONIC details

7    element-by-element how SONIC satisfies each and every asserted claim limitation in the 872 and

8    094 patents.[158]  USEI's only basis for denying that SONIC anticipates the asserted claims is a

9    rehash of a claim construction argument regarding the claimed "buffer memory" that this Court

10   previously rejected.  USEI's claim construction argument is a pure question of law that should be

11   decided on summary judgment.[159]  For the reasons described below in Section XIII, USEI's claim

12   construction argument should be rejected and this Court should grant summary judgment that the

13   asserted claims in the 872 and 094 patents are anticipated by SONIC as a matter of law.

14   **V.    NO ACCUSED PRODUCTS INFRINGE THE 459 PATENT**

15          Claims 1 and 44 are the only asserted independent claims of the 459 patent, and they are

16   only asserted against Intel (claim 1) and HP (claims 1 and 44).[160]  In construing the "means for

17   comparing" term of claim 1 under §112(6), the Court held that "length-left threshold logic" was <u>not</u>

18   a corresponding structure because "only the look-ahead threshold logic performs the function of

19

20   _____

21   [156] C.Decl. Ex. 54 (57106DOC000391).
     [157] For substantially the same reasons, MSI is also entitled to summary judgment that claim 1 of the

22   094 patent is anticipated by Intel 82593. The only alleged distinction identified by USEI's expert
     between the 82593 and claim 1 is a purported requirement that the "frame transfer task" must be

23   executed or performed in the network interface (i.e., not in the host system). *See* F.Decl. Ex. 10 at
     264:23-269:18 (Conte Depo.). Claim 1 includes no such requirement: it merely states that the frame

24   transfer task is "initiated" by the host system, and places no further restriction on where the task
     must be executed: "executing a frame transfer task initiated in the host system…" USEI's expert

25   could identify no basis to support the proposed construction (requiring the frame transfer task to be
     executed in the network interface) on which USEI's sole distinction between claim 1 of the 094

26   patent and the 82593 rests. *Id.* at 272:21-273:5 (Conte Depo.).
     [158] C.Decl. Ex. 14 at ¶¶ 554-675, Exs. 9, 11 (Wicker Rpt.).

27   [159] *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1463 (Fed. Cir. 1998) ("Disputes
     concerning the meaning of claims do not preclude summary judgment, because the resolution of

28   those disputes is part of the process of claim interpretation, a question of law.").
     [160] Claim 44 is only asserted against HP products based on a National Semiconductor chip.

counting the amount of data transferred."[161]  Both side's experts agree that the Intel products accused on the 459 patent only contain "length left" (not "look-ahead") threshold logic, which cannot satisfy the Court's construction of the "means for comparing."[162]  Furthermore, USEI's infringement reports against Intel and HP ignore that this is a means-plus-function element governed by §112(6) and do not address *any* of the corresponding structures in the 459 patent that this Court identified for the "means for comparing" (e.g., blocks 224 and 318, interrupt controller 60),[163] much less show that such structures are satisfied by the accused Intel or HP products.[164]  Dr. Mitzenmacher simply opines that the recited function is performed without regard to the Court's claim construction of corresponding structure disclosed in the specification.[165]

Additionally, claims 1 and 44 require "an alterable storage location **containing** a [transfer] threshold value," which requires the apparatus to actually contain the threshold value, rather than merely be configurable to do so.[166]  None of the Intel products satisfy this limitation because Intel disabled the accused Early Receive Interrupt feature in 1998 in all its accused products and never re-enabled it.[167]  Dr. Mitzenmacher merely identifies a register containing a value of "0" in the Intel products that turns the accused feature off, which is not the claimed "threshold value" that is compared against the counter.[168]  Dr. Mitzenmacher likewise provided no evidence of the actual configuration for any accused HP product to prove that this limitation is met.[169]

Because none of the accused products satisfy either of the above claim limitations, they do not infringe any claims of the 459 patent as a matter of law.

## VI.   313 PATENT CLAIM 13 AND 459 PATENT CLAIM 1 ARE INVALID UNDER §112

A means-plus function claim is indefinite if the corresponding structure is not disclosed in

---

[161] Dkt. 634 at 10.
[162] C.Decl. Ex. 12 at ¶¶ 868, 1045 (Crayford Rpt.); C.Decl. Ex. 7 ¶ 217 (Mitzenmacher Intel Rpt.)("the Intel source code describes a **length-left** comparison between the threshold value and a count of the amount of data remaining to be received." (emphasis added).
[163] Dkt. 634 at 10-11.
[164] C.Decl. Ex. 12 at ¶¶ 859-61 (Crayford Rpt.); Zinsli Decl. Ex. 1 at ¶¶ 174, 177 (Goshorn Rpt.)
[165] C.Decl. Ex. 7 at ¶ 210 (Mitzenmacher Intel Rpt.); Zinsli Decl. Ex. 2 at ¶¶ 118-20, 138 (Mitzenmacher HP Rpt.).
[166] C.Decl. Ex. 12 at ¶ 846 (Crayford Rpt.).
[167] C.Decl. Ex. 24 at ¶¶ 7-9, 11-13 (Brandeburg Decl.).
[168] C.Decl. Ex. 12 at ¶¶ 846, 853, 1047 (Crayford Rpt.).
[169] Zinsli Ex. 1 at ¶ 151, 156-159 (Goshorn Rpt.)

such a manner that one skilled in the art will understand what structure corresponds to the means.[170] The Court found structures corresponding to the three functions recited for the "host interface means" of claim 13 of the 313 patent, but held the claim "arguably invalid" because nothing in the intrinsic evidence indicates that a person of ordinary skill would group these three separate components into a single "means" as claimed.[171] The Court made essentially the same ruling with respect to the "means for comparing… and generating…" of claim 1 of the 459 patent.[172]

USEI's validity expert, Dr. Conte, concedes in his expert report that the Court's view of the intrinsic evidence is correct:

> 353. As one of at least ordinary skill in the art I see no reason that a single structure would be expected or required to perform the functions of "mapping data addressed to the first area...", "mapping data in the receive buffer...", and "uploading data from the receive buffer..." **There is nothing in the patent or the technology to suggest that this is the case.**[173] . . .

> 364. As one of at least ordinary skill in the art I see no reason that a single structure would be expected or required to perform the functions of "comparing..." and "generating an indication signal..." **There is nothing in the patent or the technology to suggest that this is the case.**[174]

Although Dr. Conte goes on to argue that structures performing these functions "could" be grouped together into a single larger component, he does not point to any intrinsic evidence showing this, and instead proposes hypothetical structures that differ from those in the patent.

Accordingly, there is no genuine dispute that nothing in the 313 or 459 patents suggests a single structure for performing the functions recited for the "host interface means" of claim 13 of the 313 patent and the "means for comparing… and generating…" of claim 1 of the 459 patent. The Court should confirm that these claims are invalid as indefinite under 35 U.S.C. §112.

## VII. ATTS'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO DAMAGES, OR ALTERNATIVELY, TO LIMIT THE AT&T ROYALTY BASE

Summary judgment of no damages against AT&T Services ("ATTS") is further appropriate

---

[170] *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999).
[171] Dkt. 634 at 16-17 (emphasis added).
[172] Dkt. 634 at 10-11. Since then, the Supreme Court made it easier to find a claim indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2014 WL 2440536, *2, 7-8 (2014) (rejecting the "insolubly ambiguous" standard and holding that claims must inform with "reasonable certainty.").
[173] C.Decl. Ex. 11 at ¶ 353 (Conte Rpt.) (emphasis added).

1    because USEI has no evidence supporting its ATTS royalty base.

2    **A.      USEI cannot tie the ATTS royalty base to Sigma chips sold during the damages period, as required.**

ATTS's set top boxes (STBs) are accused of infringement only because they include an allegedly infringing chip manufactured by Sigma (a "Sigma Chip"). USEI's damages expert opines that the Sigma royalty base is ▮▮▮▮▮ units, representing the number of allegedly infringing Sigma Chips that Sigma sold to all customers during the damages period.[175] He additionally opines that the ATTS royalty base is ▮▮▮▮▮ units, representing the number of STBs purchased by ATTS during the ***same*** damages period. Thus, ATTS's royalty base contains over one million units more than the total number of Sigma Chips sold to ***all*** of Sigma's customers during the damages period.[176] Presumably USEI is including STBs purchased by ATTS that incorporate Sigma Chips sold ***before*** the damages period.[177] As discussed below, all Sigma Chips sold by Sigma before the damages period are immune from damages, as are all STBs incorporating these chips downstream.

In August 2013, this Court granted partial summary judgment based on the patent marking statute, 35 U.S.C. § 287(a), such that USEI cannot recover damages from Sigma or ATTS for acts of infringement that occurred before March 10, 2010.[178] Thus, Sigma Chips sold before March 10, 2010 ("Pre-Notice Sigma Chips") cannot be included in Sigma's royalty base.

Moreover, STBs including Pre-Notice Sigma Chips cannot be included in ATTS's royalty base—no matter when ATTS purchased the STBs. As explained in *Leapfrog Enterprises v. Fisher-Price*, acts by ATTS involving Pre-Notice Sigma Chips cannot give rise to damages any more than Sigma's original sales of such chips can.[179] In *Leapfrog*, the court held that a downstream reseller's potentially infringing acts could not create liability because the upstream manufacturer sold the

---

[174] *Id.* at ¶ 364 (emphasis added).

[175] Schuster Decl. Ex. B at 2 & 7 (Bratic Report, Appx. M).

[176] Schuster Decl. Ex. C at 2 (Bratic Report, Appx. I).

[177] USEI's expert notes that ATTS buys STBs from suppliers (▮▮▮▮▮▮▮▮▮▮▮) who obtain the accused Sigma Chips directly or indirectly from Sigma. Schuster Decl. Ex. D at 774:21–775:11 (Bratic Depo).

[178] Docket Entry No. 867, at 26. USEI assumes March 10, 2010 is the relevant filing date. The damages period ended on July 28, 2012 (expiration of '313 Patent). This timeframe is accepted as the "Damages Period" for purposes of this motion.

[179] No. 03-cv-927, 2005 WL 1331216, at *4 (D. Del. June 6, 2005).

goods "under circumstances that did not subject [the upstream party] to damages" due to plaintiff's failure to mark.[180]

In effect, goods become immune from damages when they are first sold before the patent holder complied with its marking obligations. A downstream party like ATTS, therefore, cannot be liable for damages based on infringement by an immune product such as the Pre-Notice Sigma Chips. That is, ATTS cannot be liable for alleged infringement associated with Pre-Notice Sigma Chips even if ATTS performed an allegedly infringing act during the Damages Period. Thus, the Court should grant summary judgment that the ATTS royalty base cannot include any STBs containing Pre-Notice Sigma Chips as a matter of law.[181]

USEI cannot carry its burden to show that accused STBs incorporate Sigma Chips sold by Sigma during the Damages Period (as opposed to Pre-Notice Sigma Chips). The accused STBs are manufactured by third parties ███████████.[182] These parties received Sigma Chips from Sigma both before and during the Damages Period, and integrated them into STBs that ATTS purchased downstream sometime later. Yet USEI pursued no discovery of ███████████ and has no evidence showing which of the accused STBs, if any, contain Sigma Chips sold during the Damages Period versus which STBs contain Pre-Notice Sigma Chips.[183] Moreover, despite having access to discovery from Sigma, USEI failed to account even for the portion of the ██████ Sigma Chips sold during the Damages Period to other third parties with no connection to the accused

---

[180] *Id.* (quoting *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1554 (Fed. Cir. 1997)); *see also Tesco Corp. v. Weatherford Int'l Inc.*, 722 F. Supp. 2d 755, 776–77 (S.D. Tex. 2010) (relying on the Federal Circuit's interpretation of the marking statute in *Fonar*, which "can logically be read in no other way," and holding that even a downstream party's "post-notice use of a product sold under circumstances that do not subject [an upstream] seller to liability does not constitute direct infringement" by the downstream party).

[181] *Cf.* Schuster Decl. Ex. D at 775:12–776:8 (Bratic Depo) (USEI's damages expert conceding that "it appears" at least one million of the STBs in the ATTS royalty base used Sigma chips that Sigma sold ***prior*** to March 10, 2010).

[182] *See* Schuster Decl. Ex. D at 774:21–775:11 (Bratic Depo).

[183] STBs purchased by ATTS early in the Damages Period are most likely of all to include Pre-Notice Sigma Chips, and thus be immune to damages; and ATTS purchased over half of the accused STBs in the first ten months of the Damages Period. Yet USEI's expert admitted that he did not know which of those early STBs, if any, incorporated Sigma Chips sold by Sigma during the Damages Period. Schuster Decl. Ex. D at 784:21–785:23 (Bratic Depo); *see also id.* at 775:12–776:8 (USEI's damages expert conceding that "it appears" at least one million STBs in the ATTS royalty base used Pre-Notice Sigma Chips).

1   STBs. Therefore, summary judgment of no damages is appropriate.

2   **B.     Nor can USEI identify any STBs that were the subject of an allegedly infringing act by ATTS during the damages period, as required.**

3   As discussed above, to be eligible for the ATTS royalty base, a STB must include one of the

4   ▮ million accused chips sold *by Sigma* during the Damages Period. But even if USEI could

5   identify a STB that included such a chip, it has no evidence that (1) such a STB was the subject of

6   an infringing act *by ATTS* under 35 U.S.C. § 271(a); and (2) that act occurred during the Damages

7   Period.

8       **1.     Purchasing is not infringing; so the alleged ATTS royalty base lacks any infringement basis.**

9

10  Though USEI bears the burden to prove infringement,[184] its infringement expert failed to

11  identify any Section 271(a) infringing activity ATTS allegedly performed.[185] Moreover, USEI's

12  damages expert says he "was asked to *assume* by counsel that the products reported by AT&T as

13  having been purchased by AT&T were infringing products."[186] But merely purchasing a product

14  cannot give rise to liability for ATTS because purchasing is not an act of infringement.[187] USEI

15  therefore has no evidentiary foundation for its royalty base.

16      **2.     USEI cannot prove infringing acts by ATTS during the damages period.**

17  USEI also bears the burden to prove damages.[188] However, USEI improperly relies on

18  *purchase dates* to determine whether there was an act of infringement during the Damages Period.

19  To carry its burden, USEI needs to show that ATTS's purchases during the Damages Period led to

20  Section 271(a) infringing activity by ATTS before the '313 patent expired in July 2012.[189] USEI has

21  no such evidence.

22  For his ATTS royalty base, Mr. Bratic stated that he used "the total number of units that

23  AT&T *purchased during the damages period*."[190] Absent proof of any Section 271(a) activity by

---

[184] *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 846 (2014); *cf.* Schuster Decl. Ex. E at 764–69; 770–71 (Mitzenmacher Depo).
[185] Schuster Decl. Ex. A at ¶¶ 5 & 86 (Amended Mitzenmacher Report for Sigma/AT&T).
[186] Schuster Decl. Ex. D at 791:23–25 (Bratic Depo) (emphasis added); *see also id.* at 786–791.
[187] *See* 35 U.S.C. § 271(a); *Keplinger v. De Young*, 23 U.S. 358, 365 (1825).
[188] *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1217 (Fed. Cir. 1993).
[189] *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1550 (Fed. Cir. 1994).
[190] Schuster Decl. Ex. D at 787:9–13 (Bratic Depo) (emphasis added).

ATTS, purchases are irrelevant and USEI is left with no evidence about the timing of any 271(a) activity. Thus, even if USEI developed a new theory (at this too-late date) that an ATTS activity fell under Section 271(a), USEI would still need to tie that activity to the Damages Period, and to a STB containing a Sigma Chip sold by Sigma during the Damages Period. USEI cannot carry this burden.

Because USEI lacks evidence sufficient to meet its burden to establish any ATTS royalty base at trial, and for the reasons outlined above, ATTS requests summary judgment that USEI is not entitled to recover damages from ATTS. Alternatively, ATTS requests summary judgment that USEI's royalty base for ATTS cannot include any STBs containing Pre-Notice Sigma Chips as a matter of law.

## VIII. MSI'S MOTION FOR PARTIAL SUMMARY JUDGMENT TO EXCLUDE FOREIGN NON-PARTY SALES FROM USEI'S ASSERTED DAMAGES BASE

USEI seeks damages from MSI for certain models of Yukon family Ethernet controllers ("accused Yukon chips") that are not made, used, sold or offered for sale in the U.S., nor are they imported into the U.S. by MSI. ███████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ MAPL is a Singapore corporation that is a distinct legal entity from named party MSI.[191] ████████████ ██████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████████████████████████[193]

Despite these undisputed facts, Mr. Bratic admittedly included non-party MAPL sales in his damages calculations.[194]  In so doing, he argues ████████████████████████

---

[191] MAPL and named party, MSI, are each indirectly owned by a common parent corporation, Marvell Technology Group, Ltd., also not a named defendant in this case.  Kuo Decl. at ¶ 10.
[192] *Id.* at ¶¶ 11-13; Kunz Decl. at ¶ 9.
[193] Kuo Decl. at ¶ 12.
[194] F.Decl. Ex. 2 (Bratic Rep. Ex. K2); F.Decl. Ex. 3 at 279:10-20 (Bratic Depo.). ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

[197] Because U.S. patents do not have extraterritorial effect and damages cannot be based on overseas activities, USEI's damages claim on non-party MAPL's foreign sales is improper.

## A.     MSI is not liable for non-party MAPL's activities abroad

Despite MAPL's clear status as a non-party, USEI has attempted to reach MAPL's foreign sales to augment its asserted damages base.  USEI, however, has no legally cognizable basis for attributing MAPL's foreign sales to MSI.  MAPL and MSI are separate and independent legal entities, and MAPL's sales were limited entirely to foreign customers in foreign jurisdictions.[198]  As such, any damages claim based on foreign sales by MAPL is barred as a matter of law.[199]

## B.     MAPL's foreign activities cannot give rise to damages in the U.S.

Even if MAPL were a party in this action, the recovery of damages based on foreign activities has been flatly rejected by the Supreme Court, the Federal Circuit, and this Court.[200]  In *Microsoft v. ATT*, the Supreme Court held that foreign-made computers loaded with software originally created in the U.S. could not infringe a U.S. patent because the copies of the software at

---

[blacked out]; *see also id.* at 283:2-284:6, 312:12-19.

[195] Kuo Decl. Ex. A (Excerpt MRVLUSEI00060834.xls); F.Decl. Ex. 2 (Bratic Rep .Ex. K1 & Ex. K2 at 7).

[196] Kuo Decl. at ¶¶ 5-8 & Ex. A (Excerpt MRVLUSEI00060834.xls).  MSI also produced MRVLUSEI00096699.xls that includes sales of "88E8000" Yukon chips.  [blacked out], USEI does not allege this product infringes any patents.

[197] F.Decl. Ex. 1 (Davis App. F2, Sch. 2).

[198] Kuo Decl. ¶¶ 9-10, 13.

[199] *France Telecom S.A. v. Marvell Semiconductor, Inc*., Case No. 12-cv-04967, 2014 WL 1478850, at *14 (N.D. Cal. Apr. 14, 2014); *Zenith Radio Corp. v. Hazeltine Research, Inc*., 395 U.S. 100, 109-112 (1969) (vacating $35 million judgment that included non-party parent corporation). Because non-party MAPL is a separate legal entity from MSI (Kuo Decl. at ¶¶ 9-10), it is likely the Court does not have personal jurisdiction over MAPL and it would be prejudicial for the Court to exercise jurisdiction over MAPL and its activities here, especially when USEI has been on notice of MAPL's sales since at least October 14, 2013.  *Johnson v. Mammoth Recreations, Inc*., 975 F.2d 604, 609-610 (9th Cir. 1992).

[200] *Microsoft Corp. v. AT&T Corp*., 550 U.S. 437, 441 (2007); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348,1371 (Fed. Cir. 2013), *cert. denied*, 2014 WL 102413 (Jan. 13, 2014); *France Telecom*, 2014 WL 1478850, *14-*17.

1    issue were supplied and loaded overseas.[201] In *Power Integrations v. Fairchild Semiconductor*, the

2    Federal Circuit bluntly rejected the damages theory asserted by USEI in this case, stating that: "the

3    underlying question here remains whether [the patentee] is entitled to compensatory damages for

4    injury caused by infringing activity that occurred outside the territory of the United States. ***The***

5    ***answer is no***."[202] Likewise, Judge Orrick of the Northern District of California recently held in

6    *France Telecom v. Marvell Semiconductor*—a case with strikingly similar facts to those presented

7    here—that there is no basis for holding MSI liable for MAPL's sales.[203] The Court also held that

8    "[e]ven if [MSI] can be responsible for MAPL's actions, [MSI] is not liable for any infringement

9    that occurs outside the United States."[204] Here, USEI has not pointed to any U.S-based infringing

10    activities by MAPL, nor can it. As discussed above, ███████████████████████████████

11    ████████████████████████████████████████████████[205] As such,

12    USEI is not entitled to any damages based on the accused Yukon chips sold by MAPL.

13    **C.**    **MSI is not liable for importation or use of non-party MAPL chips by third parties**

14    USEI attempts to impermissibly capture up to ███ of the accused Yukon chips by

15    speculating that the chips ***may*** be imported into the United States by MAPL's foreign customers.[206]

16    As a matter of law, this theory cannot support USEI's inclusion of chips sold by non-party MAPL

17    in its damages base for alleged infringement by MSI. ██████████████████████████

18    ██████████████████████████████████████████████████████████████

19    ███████████████████████[207]

20    USEI has cited *Carnegie Mellon University v. Marvell Tech. Group*, 2013 WL 5332108

21    (W.D. Pa. Sept. 23, 2013) ("*CMU*"), for the proposition that it is permissible to assess damages

22    based on foreign sales of chips ultimately imported into the United States.[208] USEI's reliance on

23    *CMU*, which is on appeal, is misplaced. Judge Orrick fully analyzed *CMU* in light of *Microsoft* and

---

[201] *Microsoft*, 550 U.S. at 442, 454-455.
[202] *Power Integrations*, 711 F.3d at 1371.
[203] 2014 WL 1478850, at *14.
[204] *Id.*
[205] Kuo Decl. at ¶¶ 7-9, 11-13.
[206] F.Decl. Ex. 2 (Bratic Ex. K1).
[207] Kuo Decl. at ¶¶ 8, 12-13.
[208] F.Decl. Ex. 4 at ¶¶ 148-149 (Bratic Base Rpt.).

*Power Integrations* and rejected the application of *CMU* to facts similar to those presented here—namely undisputed proof that MAPL is a separate entity that manufactures, sells and delivers its chips outside the United States.[209]  Judge Orrick also fully analyzed *Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 657 (E.D. Tex. 2013), and determined that binding precedent foreclosed damages for any products that ultimately reach the United States after the extraterritorial production, use or sale of the product.[210]

In short, there is no basis for USEI to capture even a portion of accused Yukon products sold overseas by MAPL that may eventually be imported into the U.S. by other parties.

## IX.   APPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT OF CLAIMS 1, 9, 12, AND 28 OF THE 094 PATENT

USEI accuses certain Apple products of infringing claims 1, 9, 12, and 28 of the 094 patent based solely on their inclusion of Ethernet technology supplied by Sun Microsystems (the "Sun Ethernet technology").[211]  Apple does not infringe these method claims because they require use of an "Early Transmit" feature that Apple has *always* disabled in the Sun Ethernet technology.[212]

███████████████████████████████████████████████████████████████

███████████[213]  Because USEI cannot recover pre-suit damages for the other three patents-in-suit (Dkt. Nos. 867 and 921), summary adjudication that Apple's implementation of the Sun Ethernet technology did not infringe the asserted method claims of the 094 patent will completely remove all Sun Ethernet technology from this case and simplify the issues before the Court.

### A.   The Sun Ethernet technology in Apple's accused products has never been configured to do early transmit and thus cannot infringe the method claims of the 094 patent

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████[214]  In fact, the Sun documentation that USEI relies on to purportedly show infringement of the 094 patent warns that █████████████████████████████

---

[209] *France Telecom*, 2014 WL 1478850, at *16-*17.
[210] *France Telecom*, 2014 WL 1478850, at *16.
[211] *See* Cravey Decl. Ex. 1 at ¶ 1 (Mitzenmacher Apple Rpt.).  Pursuant to Civil L.R. 7-5 exhibits cited in Apple's Motion are supported by the Cravey Declaration filed herewith.
[212] *See* Cravey Decl. Ex. 3 at ¶¶ 48-52, 54-57, and 64-69 (Seifert Rpt.).
[213] *See* Cravey Decl. Ex. 2 (Apple Interrogatory Response).



215

218

When the TX_FIFO_Threshold is set to its maximum value, ███████████████████

███████████████████████████████, and a ███████████████

██████████████████████████

██████████████████████████████████████

████████████████████████████████

**B.    Conclusion**

USEI cannot show any evidence that Apple actually performed the asserted method claims of the 094 patent using the Sun Ethernet technology because Apple's configuration disables the Early Transmit feature.  The Court should thus find that none of the accused Apple products that implement the Sun Ethernet technology infringe the 094 patent as a matter of law.

**X.    ATHEROS'S, SIGMA'S, AND ATTS'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE 313 PATENT**

Pursuant to the Court's Second Claim Construction Order, the claim element "host interface means, sharing the host address space with the host, for managing data transfers between the host

---

214 *See* Cravey Decl. Ex. 3 at ¶ 50 (Seifert Rpt.); Cravey Decl. Ex. 4 at 81 (Sun Ethernet Spec.).
215 *Id.*
216 *See* Cravey Decl. Ex. 4 at 81 (Sun Ethernet Spec.).
217 *Id.*
218 *See* Cravey Decl. Ex. 5 (Ethernet driver code); Cravey Decl. Ex. 3 at ¶¶ 54-57 (Seifert Rpt.).
219 ████████████████████████████████████████████████████
    *See* Cravey Decl. Ex. 4 at 81 (Sun Ethernet Spec.).
    ████████████████████████████████████ *See*
Cravey Decl. Ex. 3 at ¶¶ 50-51 (Seifert Rpt.).
220 *See* Cravey Decl. Ex. 3 at ¶ 66 (Seifert Rpt.).

1   address space and the buffer memory in operations transparent to the host system" of Claim 1 of the

2   313 patent requires memory mapping.[222] Dr. Mitzenmacher's report regarding infringement does

3   not offer any opinion that the Atheros accused products or the accused Sigma/ATTS products meet

4   this requirement.[223] For Sigma and ATTS (the only parties accused on these claims), the same is

5   true for dependent claims 3, 5, 7, 9, 10 and claims 13, 17 and 19. For these claims, Dr.

6   Mitzenmacher refers back to the "analysis" of claim 1 that simply does not exist anywhere in the

7   opinion.[224] Because USEI has failed to put forth any evidence of infringement of this element,

8   summary judgment of non-infringement is warranted.[225]

9   ## XI.   THE INTEL PRODUCTS DO NOT INFRINGE CLAIM 21 OF THE 872 PATENT

10  ### A.   Response to USEI's alleged undisputed material facts

11      1-3.  Disputed.  The Mitzenmacher report does not "detail Intel's infringement of claim 21"

12  because Intel does not infringe, and the report fails to perform a claim analysis for each accused

13  Intel product.  The report mentions two product groupings, but it does not provide any

14  representative product analysis or give any reason why Dr. Mitzenmacher ignores many material

15  differences among these products.  Mr. Crayford's rebuttal report shows the accused Intel products

16  do not infringe, *inter alia*, because they lack the capability to satisfy claim 21 of the 872 patent.

17  ### B.   Argument

18  [221] *See* Cravey Decl. Ex. 6 at 822-823 (Mitzenmacher Depo.); *see also* Cravey Decl. Ex. 3 at ¶ 68 (Seifert Rpt.).

19  [222] Dkt. 634 at 14 (rejecting USEI's argument that mapping was not required and finding that "the
20  memory mapping function is essential to the management of data transfer between the host address space and the buffer memory 'in operations performed independently of management by the host system,' as it is disclosed in the '313 Patent.").

21  [223] Dr. Mitzenmacher's report with respect to claim 1 of the 313 patent is devoid of any mention of mapping. McCauley Decl. Ex. 2 at ¶¶ 9-10, 16-22, 24 (Mitzenmacher Atheros Rpt.); Hu Decl. Ex.
22  2 at 2-15 (Amended Mitzenmacher Sigma/AT&T Rpt.).

23  [224] With respect to claims 3, 5, 7, 9 and 10 dependent on claim 1 that mention mapping, in all instances he only refers back to the non-existent analysis of claim 1, stating "[A]s has been shown
24  in my analysis of claim 1..." Hu Decl. Ex. 2 at 15-21 (Amended Mitzenmacher Sigma/AT&T Rpt.). Similarly, for independent claim 13 he refers back to claim 1, and for claims 17 and 19 dependent
25  on claim 13 he then refers back to claims 1 and 13.  Hu Decl. Ex. 2 at 22-26 (Amended Mitzenmacher Sigma/AT&T Rpt.).

26  [225] *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1578 (Fed. Cir. 1989) (affirming summary judgment of non-infringement where "patentee failed to put forth evidence to support a finding that
27  a limitation of the asserted claim was met by the structure in the accused devices."); *see also O2 Micro Int'l. Ltd. v. Monolithic Power Systems, Inc.*, 2004 U.S. Dist. LEXIS 30244, *12-*15 (N.D.
28  Cal. Feb. 11, 2004) (granting summary judgment of non-infringement due to patentee's failure to produce evidence of infringement).

1. **USEI has failed to meet its burden to prove infringement by failing to identify any specific Intel products or perform a representative product analysis**

USEI's Motion mentions two alleged product groups ("10/100 Products" and "8254x GbE Products") but it fails to identify which Intel products fall within these alleged groupings or even specify which Intel products are at issue in the Motion. The Mitzenmacher report does not remedy this deficiency. Dr. Mitzenmacher did not analyze infringement for any specific Intel product. Instead he chose bits from documentation for many different products to piece together his opinion, never articulating any reason why he ignores the many material differences between accused products.[226] As such, USEI's Motion makes it impossible for the Court to grant the motion as to any particular Intel products or units, even if some product did infringe. As shown below, none do.

2. **USEI has failed to meet its burden to identify any activity by anyone in the United States that constitutes direct infringement under § 271(a)**

35 U.S.C. § 271(a) states, "whoever without authority **makes, uses, offers to sell, or sells** any patented invention, **within the United States** or **imports into the United States** any patented invention during the term of the patent therefor, infringes the patent."[227] USEI's motion does not identify any activity under § 271(a) much less where and when the accused activity occurred. USEI does not allege, much less prove, that Intel has performed any allegedly infringing activities in the U.S. or within the alleged damages period.[228] USEI therefore has not met its burden to show any direct infringement under §271(a), and its motion must be denied for this reason alone.

3. **The accused products do not include a "buffer memory which stores data of frames composed by a host computer for transmission on the network"**

All of the accused Intel products are chips. Unless installed into "a host computer" and configured so that the accused buffer memory "*stores* data of frames composed by a host computer for transmission on the network," no accused Intel product can meet this limitation. USEI's motion does not identify any such host computer. Further, there is no genuine dispute that the large majority of accused Intel products are ***never*** configured to store data of frames composed by a host computer for transmission on a network, because they are not paired with the proprietary "PHY"

---

[226] C.Decl. Ex. 12 at ¶¶ 871, 872, and 875 (Crayford Rpt.).
[227] 35 U.S.C. § 271(a) (emphasis added).

chip required to use the integrated network interface controller.[229]

USEI's motion misstates this limitation as "buffer memory *for storing* data of frames composed by the host computer for transmission on the communications medium," and therefore does not even allege that the actual limitation of the claim is met. This mischaracterization goes directly to USEI's argument that Intel's chips alone, with no host computer or driver software, can meet this limitation. They cannot.

**4.** **The accused products do not include "logic, coupled to the buffer memory, which monitors the transferring of data of a frame to the buffer memory to make a threshold determination…"**

USEI's motion falls short of actually asserting that this claim language is met:

The third claim element ("Element 21-3") is "logic, coupled to the buffer memory, *which monitors* the transferring of data of a frame to the buffer memory to make a threshold determination of an amount of data of the frame transferred to the buffer memory." Dr. Mitzenmacher has opined that such logic is present in all of the Intel Accused Products. The Intel 10/100 products contain a counter *for monitoring* the transferring of data of a frame to the buffer memory….[230]

As the highlighting above shows, USEI does not identify any accused device "*which monitors* the transferring of data of a frame to the buffer memory to make a threshold determination." Instead, USEI argues that logic *for monitoring* – in other words, logic which can be configured to meet this limitation – is enough. It is not, because it is not what the claim says.

USEI's motion fails to identify any computer system in which an accused Intel chip is configured so that it "*monitors* the transferring of data of a frame to the buffer memory to make a threshold determination." As discussed in the attached damages motion, Intel's driver software turns the accused "Transmit Threshold" feature off, and the accused "Early Transmit" feature is broken and does not work.[231]

**5.** **The accused products do not include "logic, responsive to the threshold determination of the logic which monitors the transferring of data to the buffer memory, which initiates transmission of the frame…prior to transfer of all of**

---

[228] *See* C.Decl. Ex. 28 at 64:7-16 (Insley Depo.) (stating that the assembly test plants for Intel are located in Costa Rica, Vietnam, China, and Malaysia).

[229] C.Decl. Ex. 12 at ¶¶ 130, 690 (Crayford Rpt.); C.Decl. Ex. 21 at 246:16-253:18. (Anzilotti Depo.).

[230] Dkt. 1133-3 at 5 (USEI's Summary Judgment Motion, emphasis added).

[231] *See, e.g., Rembrandt Data Techs., LP v. AOL, LLC*, 673 F. Supp. 2d 420, 432-433 (E.D. Va. 2009) (rev'd on other grounds) (no infringement where device was programmed to preclude claimed operation and there was no evidence of any user re-configuration to infringing operation).

Intervenors' and Defs' Motions for Summary
Judgment and Opp. to Plaintiff's Dispositive Motions
36
Case Nos. 4:10-cv-03724 CW (LB)
4:10-cv-05254 CW (LB)

1   the data of the frame to the buffer memory"

2        USEI again fails to identify any Intel product configured to be "responsive to the threshold

3   determination of the logic which monitors the transferring of data to the buffer memory, which

4   initiates transmission of the frame… prior to transfer of all of the data of the frame to the buffer

5   memory…." Instead, USEI argues that the accused products "*will* initiate transmission… *when* a

6   threshold determination is made… that the amount of data in the buffer has reached *a stored*

7   *threshold value*."[232]  USEI does not identify any system in which any Intel product is configured

8   with such a stored threshold value because, as explained in the damages motion, the accused

9   features are obsolete and unused.

10        **6.    An abstract possibility that accused products could be configured to meet the
           claim limitations is not enough**

11

12        Claim 21 requires more than an abstract "capability" as USEI contends.  A "capability" to

13   meet each limitation is only sufficient if the claim language is directed to capability.[233]  The

14   language of claim 21 is not.  USEI's reliance on *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336

15   (Fed. Cir. 2001), to argue that an accused device "may be found to infringe if it is reasonably

16   capable of satisfying the claim limitations" is misplaced.  *Hilgraeve* and its progeny stem from *Intel*

17   *Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991).  In that case, the

18   claims merely required a "programmable selection means."  Because the accused device was

19   "capable of being programmed" to operate in the claimed manner, the Federal Circuit held that the

20   "programmable" limitation was satisfied.  However, the Federal Circuit has clarified that *Intel* does

21   **not** stand for the proposition that a patentee need only show that a device is reasonably capable of

22   operating in an infringing manner in order to prove infringement:

23        The District Court read *Intel* to mean that if a particular device can be altered without
          undue difficulty to operate in an infringing manner, the device, as sold, must be
24        deemed to infringe.  **Intel does not support so broad a holding.**  All that was
          required by the limitation at issue in *Intel* was that the claimed invention, an
25        integrated circuit memory device, was 'programmable" to operate in a certain
          manner.  The accused device, although not specifically designed or sold to operate in
26        that manner, could be programmed to do so; that is, it was "programmable" to

27   _____
     [232] Dkt. 1133-3 at 6-7 (USEI's Summary Judgment Motion).
28   [233] *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) ("Unless the claim
     language only requires the capacity to perform a particular claim element, we have held that it is not
     enough to simply show that a product is capable of infringement.").

operate in the designated mode. **The claim at issue in *Intel* therefore read on the accused device, as made and sold.**[234]

The "reasonably capable" test applies only where the claim language "specifies that the claim is drawn to capability."[235]  Where the claim language specifies a particular configuration or state, as opposed to being "drawn to capability," the fact that a product is "reasonably capable of being put into the claimed configuration is insufficient for a finding of infringement."[236]

The Federal Circuit considered "active" claim language similar to that in this case in *Typhoon Touch Technologies, Inc. v. Dell, Inc.* 659 F.3d 1376, 1380-81 (Fed. Cir. 2011).  Typhoon argued its claim was infringed "if the device has the capability of being configured or programmed to perform the stated function."[237]  The Federal Circuit disagreed, finding the cases plaintiff cited "did not deal with the situation in which an apparatus does not perform the function stated in the claim unless the apparatus is specifically so programmed or configured"[238] and affirmed the "district court's holding that the claims require actual adaption, by program or configuration."[239]  As in *Typhoon Touch*, the intrinsic record here shows that the invention is not merely an optional configuration.[240]

USEI does not show that any accused product has been placed in the allegedly infringing configuration.  Intel's products are chips, not finished systems, and USEI does not identify any

---

[234] *High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.*, 49 F.3d 1551 (Fed. Cir. 1995) (emphasis added) (internal citations omitted); *see also Fantasy Sports Props. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002) ("Intel therefore does not stand for the proposition, as argued by Fantasy, that infringement may be based upon a finding that an accused product is merely capable of being modified in a manner that infringes the claims of a patent.").

[235] *Ball Aerosol & Spec. Container, Inc. v. Ltd. Brands, Inc.,* 555 F.3d 984, 994 (Fed. Cir. 2009).

[236] *Id.* at 994-95; *see also ACCO Brands, Inc. v. ABA Locks Mfr. Co., Ltd.,* 501 F.3d 1307, 1313 (Fed. Cir. 2007) (no infringement where there was insufficient proof that the accused device had actually been placed into the infringing configuration); *Adobe Sys. v. Wowza Media Sys.*, No. 11-cv-02243, 2014 U.S. Dist. LEXIS 23153, *63 (N.D. Cal. Feb. 22, 2014); *Plantronics, Inc. v. Aliph, Inc.*, No. 09-01714, 2014 U.S. Dist. LEXIS 24784, at *2, 7 (N.D. Cal. Feb. 26, 2014).

[237] *Id.* at 1380; *see also Imperium (IP) Holdings, Inc. v. Apple Inc.,* No. No. 4:11-cv-163, 2012 U.S. Dist. LEXIS 185342, at *75-76 (E.D. Tex. July 2, 2012)(the claim language required the apparatus to be configured into a particular state because it did not refer to "mere[] capabilities").

[238] *Id.* at 1380-81.

[239] *Id.* at 1382.

[240] For example, the 872 patent Abstract states that early transmission of data "is provided by a system which includes logic for transferring frames of data[.] C.Decl. Ex. B (872 patent). The Summary of the Invention similarly states "[t]he present invention provides for the early initiation of transmission of data in a network interface that includes a dedicated transmit buffer." *Id.* at 2:13-15.

---

system that contains an accused product, much less one "which monitors the transferring of data of a frame to the buffer memory to make a threshold determination" or meets the other active claim limitations. As in *Typhoon Touch,* the accused Intel products cannot "perform the functions stated in the claim" unless they are "specifically so programmed or configured" through software in a computer system.[241] No computer systems do so because the features are obsolete.

### 7. USEI misrepresents the Texas ruling

USEI misrepresents the Texas ruling when it says "TI's argument was rejected" on whether claim 21 requires actual use.[242] USEI cites no support for this assertion, and in fact, the Texas Court rejected the same abstract capability argument that USEI makes here. USEI filed a motion *in limine* to prevent TI from arguing that "apparatus claims require actual performance to be infringed."[243] The Court denied USEI's motion, allowing TI to argue noninfringement to the jury because the accused features in certain products were not actually used.[244]

### 8. USEI's validity expert testified that claim 21 requires actual use

USEI's validity expert, Dr. Conte, testified that the "logic, responsive to the threshold … which **initiates** transmission of the frame …" of claim 21 cannot be met unless all of the data of the frame has actually been stored in the buffer "at some point in time"[245] and that the claim requires "transferring all the data of the frames into a buffer and holding it."[246] This can only occur when an accused product is actually used in a configuration that performs the claimed functionality.

### 9. Even under USEI's incorrect view that claim 21 requires only abstract "capability," the accused Intel products do not infringe

#### a. The large majority of accused Intel products are incapable of satisfying various asserted claim limitations without a physical layer chip

As explained in the damages motion, because Intel has sold far more ICH and PCH chips without the required PHY chips than with them, the vast majority of accused Intel products are

---

[241] *Typhoon Touch Tech.*, 659 F.3d at 1380.
[242] Dkt. 1133-3 at 8-9 (USEI's Summary Judgment Motion).
[243] C.Decl. Ex. 43 at 8-9 (Texas Case, Dkt. 362).
[244] C.Decl. Exs. 44, 45 (Texas Cases, Dkt. Nos. 384, 390). The fact that USEI prevailed at trial against TI is irrelevant because there was evidence showing that, quite the opposite of this case, almost all of the accused TI products (93%) were configured to perform the accused functions by default. C.Decl. Ex. 50 at 79:7-9; 101:16-19 (TI June 19, 2014 Trial Tr.).
[245] C.Decl. Ex. 10 at 288:10-20 (Conte Depo.).

incapable of satisfying claim 21 because they could not provide any Ethernet functionality, much less the accused functionality.[247]  Mr. Crayford's expert analysis shows that such accused products do not satisfy at least elements 21-1, 21-3, and 21-5 of claim 21 and therefore do not infringe.[248]

### b.   USEI has not alleged that the preamble of claim 21 is satisfied

The preamble of claim 21 is a substantive limitation because it recites at least one essential feature of the claim (the CSMA/CD network) that is the antecedent basis for "the network" in later limitations.  USEI makes no showing that the preamble is met by any accused product.  Without a PHY chip or software driver, no accused products can satisfy the "network interface adapter" limitation in the preamble because they are incapable of providing an interface to the claimed CSMA/CD network or functioning as a network interface adapter.[249]

### c.   The accused "transmit threshold" and "early transmit" features are disabled and/or broken (Elements 21-3 and 21-5)

As explained in the damages motion, the accused features were disabled and/or broken and were not re-enabled.[250]  USEI has no evidence that anyone re-enabled these disabled features.[251]  Thus, the Intel products do not meet element 21-3 or 21-5 of 872 patent claim 21.[252]

### d.   USEI has not shown under its own construction that "all of the data of the frame" is stored in the buffer memory (elements 21-3 and 21-5) for any of the accused Intel products

USEI's validity expert Dr. Conte testified that claim 21 requires "some point in time" in which "all of the data of the frame" is within the buffer memory.[253]  The 459 patent explains that the "typical Ethernet data frame" includes a "source address field," a "preamble field" and a "Cyclic Redundancy Check (CRC) field."[254]  Even under USEI's incorrect view that mere "capability" will satisfy the claim elements, USEI offers no evidence that Intel products are capable of storing the

---

[246] C.Decl. Ex. 47 at 60:21-61:17 (TI April 10, 2014 Trial Tr.).
[247] *Id.* at 251:19-252:13.
[248] C.Decl. Ex. 12 at ¶¶ 948, 687-98 (Crayford Rpt.).
[249] *Id.* at ¶¶ 687-89; 578.
[250] Carkin Decl. at ¶¶ 5-6; C.Decl. Ex. 25 at 138:11-22; 139:1-13 (Carkin Depo.); Ex. 12 at ¶¶ 587-99, 134 (Crayford Rpt.)("Intel defeatured this **non-capability**; …"); C.Decl. Ex. 32 at ¶¶ 10-18 (Sharoni Decl.); C.Decl. Ex. 12 at ¶¶ 572-586 (Crayford Rpt.); C.Decl. Ex. 27 at 38:8-38:16 (Conover Depo.).
[251] C.Decl. Ex. 6 at 234:3-22 (Mitzenmacher Depo.).
[252] C.Decl. Ex. 12 at ¶¶ 943, 945, 951, 953 (Crayford Rpt.).
[253] C.Decl. Ex. 10 at 288:10-20 (Conte Depo.).

preamble and the CRC field in the accused buffer memory (i.e., the transmit FIFO).  These portions of the frame are generated separately and are not stored in the FIFO.[255]  USEI's contention that the explanation of "frame" in the 459 patent was a "drafting error" is not credible.[256]  The meaning should be ascertained from the asserted patents (which share the same inventors and all originated from the same project), not from USEI's extrinsic evidence.

USEI does not dispute that the "source address" is part of the frame.  Many accused Intel products include source address insertion, which precludes storage of the source address in the accused buffer memory[257] as Dr. Conte's view requires.  Similarly, many of the accused Intel products are configured to use a "checksum offload" feature that Dr. Mitzenmacher concedes is incompatible with the asserted 872 claims.[258]  Thus, these Intel products do not satisfy elements 21-3 and 21-5 of the 872 patent for the independent reasons above.[259]

## XII.   INTEL DID NOT COPY AND DOES NOT HAVE UNCLEAN HANDS

### A.   Response to USEI's alleged undisputed material facts

1-9.  Disputed for the reasons explained below.  Intel did not copy 3Com's products.

10.  Disputed.  Intel admits that both Intel and 3Com conducted competitive testing of one or more of the other's products in the 1990's, which was standard industry practice.

### B.   Argument

Intel did not copy 3Com's products, and USEI's focus on documents from the early 1990s that are unrelated to any accused product or the patents in suit is an improper distraction.  USEI's allegations concern an Intel product (the 82595TX) that USEI's experts never compared to the asserted claims, and a 3Com product (the Etherlink III) that USEI's experts could not even identify

---

[254] C.Decl. Ex. C at 29:40-44 (459 patent); C.Decl. Ex. 12 at ¶ 724 (Crayford Rpt.).
[255] C.Decl. Ex. 12 at ¶¶ 726-27 (Crayford Rpt.).
[256] C.Decl. Ex. 11 at ¶¶ 253-255 (Conte Rpt.).
[257] C.Decl. Ex. 12 at ¶¶ 727, 731 (Crayford Rpt.).
[258] *Id*. at ¶¶ 699, 705-07; *see also id.* at ¶¶ 699-715; C.Decl. Ex. 53 at ¶ 48 (Mitzenmacher Intel Base Rpt.); Conover Decl. at ¶¶ 27-30; C.Decl. Ex. 55 at 57118DOC009762-63 (57118DOC009370); *see also* C.Decl. Ex. 56 at 57132DOC009096-97 (57132DOC008739)("Early Transmit is not possible in conjunction with checksum offloading").
[259] C.Decl. Ex. 12 at ¶¶ 720-733, 954, 946, 949, 956 (Crayford Rpt.).

1    or describe, much less compare to the asserted claims.[260]  Critically, USEI's expert Dr. Conte has

2    admitted that neither the Etherlink III nor the Intel 82595TX are covered by the asserted claims.

3        Intel's witnesses have denied USEI's allegations in deposition, and Intel's experts

4    thoroughly analyzed the products in question and showed that USEI's allegations are false.[261]

5        Even if USEI's meritless copying allegations were assumed to be true (and they certainly are

6    not), they are irrelevant and inadmissible under Federal Rule of Evidence 402 and 403 because

7    USEI has not shown (and cannot show) that Intel copied (a) anything covered by any asserted

8    claim, or (b) anything that was incorporated into any accused product.[262]

9        **1.      There is no nexus between the allegedly copied product and the asserted claims**

10       USEI's "copying" allegation is based wholly on emails showing that Intel tested and

11   discussed a 3Com product in 1992.  Performing this type of market study on a competitor's product

12   was standard industry practice.[263]  Indeed, 3Com performed the same type of analyses on Intel

13   products.[264]  Intel did nothing wrong.

14       The emails refer to "Parallel Tasking," a 3Com marketing term applied to a commercial

15   product (the "EtherLink III" adapter) that 3Com released in 1992.[265]  USEI's Motion incorrectly

16   equates this marketing term with the asserted claims.  Yet USEI has not identified any nexus

17   between any asserted claim and the Etherlink III or any other 3Com product, as required by Patent

18   Local Rule 3-1(g) to preserve its right to assert that any 3Com product practices any claimed

19

20   ───────────────

     [260] C.Decl. Ex. 6 at 290:16-293:19; 305:2-11, 307:13-23 (Mitzenmacher Depo.); C.Decl. Ex. 10 at

21   79:1-24; 178:1-179:22; 202:11-21 (Conte Depo.)
     [261] C.Decl. Ex. 21 at 50:2-18, 117:3-11; 118:16-119:3, 120:6-17, 125:10-19 (Feb. 18, 2014 Anzilotti

22   Depo.); C.Decl. Ex. 30 at 225:15-226:3 (Wartski Depo.); C.Decl. Ex. 12 at ¶¶ 135-184 (Crayford
     Rpt.); C.Decl. Ex. 14 at ¶¶ 164-182 (Wicker Rpt.).

23   [262] *See Amazon.com, Inc. v. Barnesandnoble.Com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir.
     2001)("[E]vidence of copying Amazon's '1–Click®' feature is legally irrelevant unless the '1–

24   Click®' feature is shown to be an embodiment of the claims); *ICU Medical, Inc. v. Rymed Tech.,
     Inc.*, 752 F.Supp.2d 486, (D. Del. 2010)(excluding evidence of copying under Rule 402 because the

25   plaintiff did not show that the copied product "embodies any of the asserted claims in the patents at
     issue" and "introduction of such contentions would cause substantial delay, wasted time, and

26   confusion because it would require mini-trials to determine whether [the defendant] actually copied
     the unrelated ICU devices nearly twenty years ago.").

27   [263] *Id.* at ¶ 152 (Crayford Rpt.).
     [264] *Id.*

28   [265] C.Decl. Ex. 12 at ¶¶ 140-42, 146-47 (Crayford Rpt.); C.Decl. Ex. 14 at ¶¶ 125, 170, 774, 755
     (Wicker Rpt.); C.Decl. Ex. 60 at 1 (InfoWorld, August 31,1992).

1    invention.[266]

2         USEI's expert reports likewise offered no analysis showing that any 3Com product practiced

3    any asserted claim.[267]  At deposition, Dr. Conte could not even identify the 3Com product that was

4    allegedly copied, and Dr. Mitzenmacher did not know what kind of architecture it contained.[268]

5         "Parallel Tasking" does not refer to the claimed invention or even to the general notion of

6    early transmit, which was already used in prior-art Intel products.[269]  For example, Mr. Mazor's

7    email states, "The concept of 'Parallel Tasking', as implemented by 3Com in its recent single chip

8    E-NET controller, is a novel approach to emulating the operation of a bus master, by a slave LAN

9    controller and the host CPU."[270]  As Intel's experts thoroughly explain, the "Parallel Tasking"

10   feature discussed in the Intel emails is "quite different" than what is described in the asserted

11   patents or in any of Intel's accused products.[271]  Further, Intel could not possibly have copied any of

12   the asserted patents because they did not issue until years later – the earliest issued in 1994.

13        Critically, the expert report and deposition of USEI's expert Dr. Conte shows the absence of

14   any nexus between the asserted claims and the 3Com product discussed in the emails, because the

15   3Com Etherlink III product that USEI alleges Intel copied could not have practiced the asserted

16   claims.  Dr. Conte's report explains that the asserted 872 and 094 claims require a "bus mastering

17   interface" that excludes "slave" adapters that use "programmed I/O."[272]  3Com's EtherLink III

18   Parallel Tasking Adapter Drivers Technical Reference states that "programmed I/O (PIO) is the

19   only method of data transfer supported" by the Etherlink III.[273]  **Dr. Conte admitted that this**

20   _____

21   [266] C.Decl. Ex. 61 at 8-9 (USEI's Second Amended Patent L.R. 3-1 Infringement Contentions).

22   ████████████████████████████████ C.Decl. Ex. 51 at 67:1-10 (TI June 16, 2014 Trial Tr.).

23   [267] C.Decl. Ex. 10 at 79:1-24 (Conte Depo.); C.Decl. Ex. 6 at 27:2-9; 290:16-291:25;
     (Mitzenmacher Depo.).

24   [268] C.Decl. Ex. 10 at 79:1-14 (Conte Depo.)("I didn't investigate it."); C.Decl. Ex. 6 at 292:4-23;
     307:13-16 (Mitzenmacher Depo.).

25   [269] C.Decl. Ex. 12 at ¶¶ 154-55, 157 (Crayford Rpt.); C.Decl. Ex. 14 at ¶¶ 165-66, 170-171, 178,
     180, 774 (Wicker Rpt.).

26   [270] C.Decl. Ex. 57 at 005 (57167DOC000173); C.Decl. Ex. 12 at ¶ 146 (Crayford Rpt.).

27   [271] C.Decl. Ex. 12 at ¶¶ 136-37 (Crayford Rpt.); *see also id.* at ¶¶ 164-181; C.Decl. Ex. 14 at ¶¶ 129,
     172, 174-77 (Wicker Rpt.).

28   [272] C.Decl. Ex. 11 at ¶¶ 167-170, and 177-180 (Conte Rpt.).
     [273] C.Decl. Ex. 59 (57188DOC002966).

1   **3Com technical reference manual shows that 3Com Etherlink III adapters could not meet the**

2   **"bus mastering interface" limitation.**[274]   The 872 and 094 patents thus cannot cover the 3Com

3   product that USEI alleges Intel copied.

4          **2.**      **Intel did not copy any patented "Parallel Tasking" technology**

5         The product that USEI claims resulted from the alleged copying, Intel's 82595TX ("D10-

6   prime"), is not accused of infringement.  Dr. Mitzenmacher testified that he never analyzed the

7   82595TX to assess infringement.[275]   Critically, **Dr. Conte testified that the description of**

8   **"concurrent processing" in 82595TX did not include any threshold determination**, and as a

9   result, the type of "early transmit" used in the 82595TX does not infringe the 872 and 094 asserted

10   claims because it lacks the "monitoring" and "threshold determination" limitations required by each

11   of the claims.[276]

12         Mike Anzilotti, a former Intel engineer, testified that Intel did not copy 3Com's "Parallel

13   Tasking" feature.[277]   In developing the 82595TX product, Intel instead used its own prior

14   experience and similar features that it had already developed in Intel's prior art products, including

15   the Intel 82596 controller.[278]   The 82595TX ultimately had limited success, and Intel did not use the

16   architecture of the 82595TX in any other Intel products.[279]

17         Aside from baseless innuendo, USEI has not attempted to show that any "parallel tasking"

18   features discussed in the Intel emails were ever copied into any accused Intel product.  And there is

19   no basis for any such accusation.  **In documents that 3Com created in 2001 before this litigation,**

20   **3Com told the world that Intel did not use its "Parallel Tasking" technology.**[280]

21         Additionally, as Dr. Mitzenmacher admitted, all of the Intel accused products in this case are

22

23   ───────────────────

24   [274] C.Decl. Ex. 10 at 163:8-164:14; 165:18-166:24 (Conte Depo.).
     [275] C.Decl. Ex. 6 at 305:2-6 (Mitzenmacher Depo.); C.Decl. Ex. 12 at ¶ 159 (Crayford Rpt.).

25   [276] C.Decl. Ex. 10 at 180:20-181:9, 202:11-21 (Conte Depo.).
     [277] C.Decl. Ex. 21 at 117:3-11; 118:16-119:3; 120:6-17; 125:10-19 (Anzilotti Depo.); C.Decl. Ex.
     12 at ¶ 154 (Crayford Rpt.).

26   [278] *Id.*
     [279] C.Decl. Ex. 30 at 225:15-226:3 (Wartski Depo.); C.Decl. Ex. 12 at ¶ 162-63 (Crayford Rpt.);

27   C.Decl. Ex. 14 at ¶ 168 (Wicker Rpt.).
     [280] C.Decl. Ex. 12 at ¶ 158 (Crayford Rpt.); C.Decl. Ex. 39 (3COM045754); C.Decl. Ex. 40

28   (3COM041687).

bus masters with Direct Memory Access (DMA) features.[281]  They do not include the "Parallel Tasking" architecture from 3Com's EtherLink III, which was a "slave" with a substantially different architecture (programmed I/O) and no DMA, which merely attempted to "emulate" a bus master.[282]  3Com ultimately moved away from this architecture and toward the bus mastering architecture that Intel pioneered.[283]  3Com did not release its first-generation bus mastering adapters until 1995, many years after Intel did.[284]  Unlike USEI's experts, Mr. Crayford performed an analysis comparing this "Parallel Tasking" architecture with the accused Intel products and showed that Intel did not copy 3Com based on the many substantial differences between the "Parallel Tasking" architecture and the accused Intel products (among other reasons).[285]

Importantly, USEI's validity expert admitted that he could find <u>no</u> distinctions between Intel's prior-art 82593 product and the majority of the asserted independent claims in the 872 and 094 patents.[286]  USEI contends that these claims cover the "early transmit" idea that USEI alleges Intel copied, and thus USEI's expert has conceded that Intel's prior-art 82593 product already included the allegedly copied ideas.  While USEI incorrectly denies that the Intel 82593 is prior art, there is no dispute that Intel developed and released its 82593 product before 3Com released the EtherLink III product that USEI alleges Intel copied.[287]  Therefore, even if the 82593 were not prior art (it is), there is no genuine dispute that Intel had already made its own product that practiced the claimed invention long before Intel could possibly have copied the 3Com product.

### 3.   Neither Intel nor any other Defendant has engaged in litigation misconduct

USEI's claim of "litigation misconduct" is baseless.  "A witness may be compensated for the time spent preparing to testify or otherwise consulting on a litigation matter in addition to the

---

[281] C.Decl. Ex. 6 at 306:2-308:5 (Mitzenmacher Depo.); C.Decl. Ex. 12 at ¶¶ 159-69 (Crayford Rpt.).
[282] *Id.* at ¶¶ 140, 146, 167-170, 180-81.
[283] C.Decl. Ex. 12 at ¶¶ 182-83 (Crayford Rpt.); C.Decl. Ex. 14 at ¶ 172 (Wicker Rpt.).
[284] C.Decl. Ex. 12 at ¶ 182 (Crayford Rpt.).
[285] *Id*. at ¶¶ 164-182.
[286] C.Decl. Ex. 11 at 78:18-25 (Conte Depo.) (finding no distinctions between 82593 and 872 claim 21), and 104:5-105:15 (finding no distinctions between 82593 and 094 claims 9, 28, and 39).
[287] The Intel 82593 was released by May 1991.  Anzilotti Decl. ¶¶3-5; C.Decl. Ex. 21 at 33:6-34:10; 191:22-192:16; 259:14-21 (Anzilotti Depo.).  The Etherlink III was released in August 1992. C.Decl. Ex. 60 at 1 (InfoWorld (August 31, 1992)); C.Decl. Ex. 14 at ¶755 (Wicker Rpt.).

1   time spent providing testimony in a deposition or at trial."[288]  Likewise, there can be no "unclean

2   hands" because USEI cannot show any unconscionable act.[289]  There was no wrongdoing in the

3   consulting agreement between HP and its recently-departed former employee Richard Baker, and

4   any alleged prejudice has already been resolved by the Court.[290]  USEI does not and cannot credibly

5   allege any prejudice concerning Mr. Fawal.  Tellingly, USEI itself has paid former 3Com employee

6   Bruce Sanders over $29,000 for consulting work and time spent testifying for USEI.[291]

7   **XIII.  SONIC ANTICIPATES THE ASSERTED CLAIMS OF THE 872 AND 094 PATENTS**

8   **A.     Response to USEI's alleged undisputed material facts**

9        1.  Defendants do not dispute that the SONIC device contains a 32-byte buffer memory.

10  This fact does not support USEI's motion because (a) the asserted claims do not require a buffer

11  memory that stores a complete Ethernet frame or any minimum number of bytes all at one time, and

12  (b) in any event, SONIC can store and transmit non-standard frames that are less than 32 bytes.

13       2.  Defendants do not dispute the minimum size of an IEEE 802.3-compliant Ethernet frame

14  is 64 bytes. This fact does not support USEI's motion for the same reasons described for Fact No. 1.

15       3.  Disputed.  The SONIC FIFO buffer memory can "hold" all of the data of an Ethernet

16  frame during transmission since all of the data of a transmitted frame is temporarily stored the FIFO

17  buffer memory during transmission.  Intel does not dispute that the SONIC FIFO cannot hold all of

18  the data of a standard 802.3 compliant Ethernet frame all at one time, and this is irrelevant because

19  it is not required by the claims.  Instead, the claims are inconsistent with a requirement that the

20  claimed "buffer memory" hold an entire frame all at one time because the claimed system begins

21  transmitting frame data out of the buffer memory prior to receipt of all of the data of the frame.

22  **B.     Argument**

23       **1.     SONIC discloses each and every element of the asserted claims of the 872 and
             094 patents**

24

25  ─────────────────────────────
    [288] *Prasad v. MML Inv. Services, Inc.*, No. 04-civ-380, 2004 WL 1151735, at *5-6 (S.D.N.Y. 2004).
    [289] *See Aristocrat Techs. v. Int'l Game Tech.*, No. C-06-03717, 2010 U.S. Dist. LEXIS 145486, at
26  *9-10 (N.D. Cal. June 15, 2010) (holding that there was no showing of an "unconscionable act,
    which is required to state a claim of unclean hands" after a party compensated the named inventor
27  of the asserted patents $100,000 (AU) for his work as a litigation consultant).
    [290] *See* Dkt. 866, 900 at 4:16-17.
28  [291] C.Decl. Ex. 48 at 55:13-17 (TI June 17, 2014 Morning Trial Tr.).

1    USEI admits in its Motion on page 16 that SONIC is prior art.  Dr. Wicker's invalidity

2    analysis and claim charts for SONIC detail how it satisfies every asserted claim limitation in the

3    872 and 094 patents.[292]   USEI does not rebut any aspect of Dr. Wicker's analysis or dispute that

4    SONIC satisfies each and every element of the asserted claims of the 872 and 094 patents <u>as the</u>

5    <u>claims have been construed by this Court</u>.[293]   USEI's Motion should thus be denied.[294]

6        **2.**    **The asserted claims do not require "a buffer memory capable of storing a full ethernet frame" as USEI argues**

7

8        **a.**    **This Court has already rejected USEI's incorrect construction**

9    USEI argues that "the plain language of the 872 and 094 Patent claims demonstrate that the

10   buffer memory must be **capable of holding an entire frame of data**."[295]   USEI previously made a

11   nearly identical argument when it argued that "the buffer memory is **able to retain a frame of data**

12   that has been transmitted" for the same reasons.[296]   The argument was based on the same claim

13   language cited on page 20 of its Motion (i.e., "stores data of frames …." at Col. 32:63-65).[297]   The

14   Court rejected USEI's argument, holding that USEI's "additional language would add a limitation

15   that is not required by the specification."[298]   This Court should reject USEI's new word-smithing of

     its old construction for the same reasons set forth in its first claim construction order.

16

17       **b.**    **USEI should be precluded from offering any new constructions that it did not disclose during claim construction**

18   To the extent that USEI contends that "capable of holding an entire frame of data" is

19   different than its rejected construction "able to retain a frame of data," USEI should not be allowed

20   to offer new constructions.  Despite multiple rounds of disclosures, briefing, and claim construction

21   orders, USEI never raised this construction.  Instead, USEI proposed and agreed to the construction

22   of "buffer memory" as "a memory for temporary storage of data" that it now challenges.[299]

23

---

[292] C.Decl. Ex. 14 at ¶¶ 554-675, Exs. 9, 11 (Wicker Rpt.).
[293] USEI's validity expert admitted he did not identify any of the Court's claim constructions as distinguishing SONIC from the 872 patent claims.  C.Decl. Ex. 10 at 55:20-56:6 (Conte Depo.).
[294] SONIC also renders the asserted claims obvious under USEI's incorrect construction, but USEI does not move on the issue of obviousness so it need not be addressed here.
[295] SJ Motion at 19 (emphasis added).
[296] Dkt. 552 at 23-26.
[297] Dkt. 539-1 at 8.
[298] Dkt. 586 at 21; C.Decl. Ex. 14 at ¶ 576 (Wicker Rpt.).
[299] Dkt. 539-1 at 3; Dkt. 586 at 21.

1    Allowing USEI to inject a new construction into the proceedings at this late stage would run

2    counter to both the spirit and letter of the Patent Local Rules. As one court recently explained,

3    these Rules "require the identification of any claim terms needing construction early in the

4    litigation;" otherwise, "parties could constantly change their positions, making resolution

5    difficult."[300] Allowing USEI to raise this new construction now will severely prejudice Defendants.

6         **c.**    **USEI's newly proposed construction contradicts the intrinsic record**

7    USEI also argues that other language in some claims supports its attempt to re-construe

8    "buffer memory." Specifically, USEI cites to "logic … which initiates transmission of the frame

9    from the buffer memory to the medium access controller prior to transfer of all of the data of the

10   frame to the buffer memory when no complete frame is present in the buffer memory" in claim

11   21.[301] This language does not require that all of the data of a frame be stored in the buffer memory

12   **all at once**. Instead, it requires initiating transmission of the frame **from** the buffer memory **to** the

13   medium access controller **before** all of the data of the frame is fully transferred **to** the buffer

14   memory. In other words, the frame is being moved from the buffer to the network before all of the

15   frame has been moved to the buffer. Rather than meaning that a complete frame must be present in

16   the buffer memory, it means the opposite.

17   Importantly, USEI's new construction also contradicts representations made to the Patent

18   Office that the claimed "buffer memory" is "for storing a number of bytes of a packet."[302]

19   USEI's new construction also excludes the preferred embodiment, which does not store all

20   of the data of the frame in buffer memory.[303] For example, the frame preamble and CRC codes are

21   not stored in the buffer memory.[304] FIG. 12 of the 459 patent shows that the preamble and CRC

22   codes are part of the frame.[305] USEI argues that FIG. 12 is a "drafting error," which is not

23

---

24   [300] *Mediatek Inc. v. Freescale Semiconductor, Inc*., No. 11-cv-5341-YGR, 2014 U.S. Dist. LEXIS 31461, at *12-13 (N.D. Cal. Mar. 5, 2014) (internal citations omitted).

25   [301] SJ Motion at 20.
     [302] C.Decl. Ex. 62 at 1-2 (March 2, 1994, Rule 131 Declaration) ("5. … Implicit in this description

26   is the first element of claim 1, a buffer memory for storing a number of bytes of a packet, that is storing 'data of frames' as recited in the claim.").

27   [303] C.Decl. Ex. 14 at ¶¶ 578-583 (Wicker Rpt.).
     [304] *Id*.

28   [305] *Id*. at ¶ 579; C.Decl. Ex. C at 29:40-44; Fig. 12 (459 patent).

1    credible.[306]

2        Finally, USEI's argument about the testimony of TI's non-infringement expert is irrelevant

3    because it is extrinsic and occurred when TI's expert applied an incorrect claim construction USEI

4    had argued at the prior invalidity trial, based on a judicial estoppel theory.[307]

5                    **d.    Judicial estoppel precludes USEI's new proposed construction**

6        USEI's counsel directly contradicted its new claim construction in Texas and argued in

7    closing that the claimed "buffer memory" had no size requirement whatsoever:

8            As you're considering the infringement issues, there's a couple of things.  First
         you'll see here: Buffer memory.  His Honor has defined buffer memory, and it's a
9            memory for temporary storage of data.  It doesn't say anything else about minimum
         size, maximum size, 60 bytes, 1500 bytes.  It's not there. So these arguments, these
10           distractions about how big the buffer memory needs to be is not an issue.[308]

11   "It is well-established that a party who successfully argues one position is estopped from later

12   adopting a contrary position in a case involving the same patent."[309]  USEI's Texas argument is

13   contrary to its new construction here that the "buffer memory" has a minimum size of 64 bytes to be

14   "capable of holding an entire frame of data."  It is unjust for USEI to argue one position to win an

15   infringement verdict in Texas and then argue the opposite here to distinguish prior art.

16               **3.    If USEI's incorrect claim construction were applied, then there is at least a
               disputed issue of material fact to preclude summary judgment**

17
18       Even under USEI's incorrect construction, SONIC anticipates the asserted claims.  SONIC's

19   designer Mr. Lee and Dr. Wicker testified, as corroborated by SONIC documentation,[310] that

20   SONIC can send and receive non-standard frames smaller than SONIC's 32-byte buffer.[311]  The

21   "frames" in claim 21 are not limited to "Ethernet" frames or the 802.3 standard.[312]

22               **4.    The jury verdicts cited by USEI are irrelevant**

23       The jury verdicts cited by USEI are irrelevant because there is no collateral estoppel against

24   ────────────────────
     [306] C.Decl. Ex. 11 at ¶¶ 253-255 (Conte Rpt.).
25   [307] C.Decl. Ex. 50 at 7:14-20, 9:7-18 (TI June 19, 2014 Trial Tr.), Ex. 49 at 125:3-126:4; 128:12-
     131:8 (TI June 18, 2014 Trial Tr.).
26   [308] C.Decl. Ex. 50 at 103:6-15 (TI June 19, 2014 Trial Tr.).
     [309] *Organic Seed Growers & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1358 (Fed. Cir. 2013);
27   *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001).
     [310] C.Decl. Ex. 14 at ¶ 587 (Wicker Rpt.); C.Decl. Ex. 13 at 208:17-209:14-23 (Wicker Depo.).
28   [311] C.Decl. Ex. 14 at ¶ 587 (Wicker Rpt.); Ex. 13 at 206:12-209:23 (Wicker Depo.); Ex. 46 at 8:16-
     16:9 (TI April 7, 2014 Trial Tr.).

1    any of the Defendants here since none were parties in the prior cases involving the jury verdicts.[313]

2    Also, USEI made arguments at the TI trial that contradict this Court's claim construction order.[314]

3    The Realtek verdict is also irrelevant because SONIC was not even at issue in the Realtek trial.

4        **5.    The patent office did not have or consider the material SONIC disclosures**

5        SONIC is mentioned only as "representative prior art" in the 872 patent.  It gives no hint

6    that in SONIC, "threshold logic monitors the number of bytes as they are written into the FIFO" and

7    SONIC initiates transmission "[w]hen the threshold has been reached" as the SONIC Datasheet

8    states.[315]  SONIC is not listed in the "References Cited" in any patent-in-suit, and the file history

9    shows the patent examiner did not consider SONIC.[316]  USEI's argument that Mr. Lee "admitted

10   that the relevant functionality of the SONIC was adequately disclosed" in the 872 patent is

11   wrong.[317]  Mr. Lee's testimony does not suggest that the 872 patent discloses the "threshold logic"

12   or other material details of the SONIC datasheet.[318]

13       For the above reasons, the Court should deny USEI's motion and grant the Defendants'

14   motion that SONIC anticipates all asserted claims in the 872 and 094 patents as a matter of law.

---

[312] C.Decl. Ex. 13 at 207:19-208:5 (Wicker Depo.).
[313] *See, e.g., Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1091 (Fed. Cir. 1987); *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1569 (Fed. Cir. 1993).
[314] C.Decl. Ex. 47 at 92:16-25 (TI April 10, 2014 Trial Tr.); C.Decl. Ex. 14 at ¶¶ 575-76, 823 (Wicker Rpt.).
[315] C.Decl. Ex. 19 at 9 (Sonic Datasheet).
[316] *Id*. The Manual of Patent Examining Procedure instructs that prior art references such as SONIC that are merely listed in the Specification (as opposed to being properly disclosed in an Information Disclosure Statement under 37 CFR 1.98) are not considered by the patent examiner.  *See* MPEP § 609.04(a)(I); 6.49.06 ("unless the references have been cited by the examiner on form PTO-892 [Notice of References Cited], they have not been considered.").
[317] Dkt. 1133-3 at 19 (USEI's Summary Judgment Motion).
[318] Dkt. 1133-4 (Nation Decl. Ex. Z).

1

2   Dated:  July 15, 2014                    WEIL, GOTSHAL & MANGES LLP
                                            By:  /s/ Garland T. Stephens
3                                                Garland T. Stephens

4                                           Counsel for Intervenor INTEL CORPORATION

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28